Robert STUART and Lin Farquhar-Stuart,
Plaintiffs-Appellants-Cross-Respondents,

v.

WEISFLOG'S SHOWROOM GALLERY, INC.,
and Ronald R. Weisflog, Defendants-
Respondents-Cross-Appellants-Petitioners,†

AMERICAN FAMILY MUTUAL INSURANCE CO.,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2005AP886. Oral argument September 5, 2007.
—Decided March 28, 2008.*

2008 WI 22

(Also reported in 746 N.W.2d 762.)

† Motion for reconsideration filed.

104

For the defendant-respondent-petitioner there were briefs by *Paul J. Pytlik, Michelle M. Stoeck,* and *Hills Legal Group, Ltd.,* Waukesha.

For the defendants-respondents-cross-appellants-petitioners there were briefs by *James C. Ratzel, Joya J. Santarelli,* and *Ratzel and Associates, LLC,* Brookfield, and oral argument by *James C. Ratzel.*

For the plaintiffs-appellants-cross-respondents there was a brief by *James J. Carrig, Matthew R. Jelenchick,* and *Niebler, Pyzyk, Klaver & Carrig LLP,* Menomonee Falls; *Ryan M. Benson* and *Benson Law Office,* Siren; and *Roy E. Wagner* and *von Briesen & Roper SC,* Milwaukee, and oral argument by *Roy E. Wagner.*

An amicus curiae brief was filed by *Lori M. Lubinsky, Robert C. Procter, Carl A. Sinderbrand,* and *Axley Brynelson, LLP,* Madison, on behalf of the Wisconsin Builders Association, and oral argument by *Lori M. Lubinsky.*

An amicus curiae brief was filed by *Alan G. B. Kim, Jr., Abigail C.S. Potts,* and *Anderson & Kent, S.C.,* Madison, on behalf of NARI of Madison, Inc.

An amicus curiae brief was filed by *John S. Greene,* assistant attorney general, *Nelle R. Rohlich,* assistant attorney general, and *J.B. Van Hollen,* attorney general.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published decision of the court of appeals,[1] affirming in part, reversing in part, and remanding with directions,

---

[1] *Stuart v. Weisflog's Showroom Gallery, Inc.,* 2006 WI App 109, 293 Wis. 2d 668, 721 N.W.2d 127.

an order of the Circuit Court for Waukesha County, Judge Patrick C. Haughney.[2]

¶ 2. Petitioners, Weisflog's Showroom Gallery, Inc. (WSGI), Ronald Weisflog (Weisflog) individually, and American Family Mutual Insurance Company, WSGI's and Weisflog's insurer, seek review of the court of appeals' decision that affirmed in part and reversed in part the circuit court's judgment in favor of the respondents, Robert Stuart and Lin Farquhar-Stuart (collectively, the Stuarts). This case involves the interpretation and application of the Home Improvement Practices Act (HIPA), which is contained in Wis. Admin. Code § ATCP 110 (Oct., 2004)[3] (ATCP 110), and Wis. Stat. § 100.20(5) (2003–04)[4].

¶ 3. There are six principal issues upon review: 1) Whether the HIPA and negligence claims of the respondents are barred by a statute of limitations? 2) Whether the HIPA, which provides for the doubling of damages "because of a violation . . . of any order" (Wis. Stat. § 100.20(5)) issued pursuant to HIPA, authorizes the doubling of an entire damage award even if a HIPA violation is combined with additional wrongdoing that contributes to the loss in question? 3) Whether, given the evidence presented in the present case, the circuit court committed error in asking the jury to apportion damages between the Stuarts' HIPA claims and their negligence claims? 4) Whether the economic loss doctrine (ELD) applies to bar the HIPA violation claims or

---

[2] The companion case to this case, *Stuart v. Weisflog's Showroom Gallery, Inc.,* 2008 WI 86, ___ Wis. 2d ___, 753 N.W.2d 488 (*Stuart II*),was released on July 10, 2008.

[3] All further references to the Wisconsin Administrative Code are to the October 2004 version unless otherwise noted.

[4] All further references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

the negligence claims of the respondents? 5) Whether a corporate employee may be held personally liable for acts, he or she takes on behalf of the corporate entity that employs him or her, that violate the HIPA? and 6) Whether the circuit court erred in its determination of the appropriate attorney fee award?

¶ 4. We affirm the decision of the court of appeals. In doing so, we hold as follows on each of the six principal issues. First, we hold that the Stuarts' HIPA claims and their negligence claims are not barred by the statute of limitations because their claims are governed by the discovery rule and the six-year statute of limitations set forth in Wis. Stat. § 893.93(1)(b). Second, we are satisfied that Wis. Stat. § 100.20(5) authorizes the doubling of an entire damage award, even if a HIPA violation is combined with additional wrongdoing that contributes to the loss in question. Third, based on the evidence in the record and on the facts of the present case, we hold that the circuit court erred by asking the jury to apportion damages between the Stuarts' HIPA claims and their negligence claims. Fourth, we are satisfied that the ELD is inapplicable to the Stuarts' claims, and, therefore, does not bar their claims. Fifth, we hold that a corporate employee may be held personally liable for acts, he or she takes on behalf of the corporate entity that employs him or her, that violate the HIPA. Lastly, we hold that the circuit court erred in its determination of an appropriate attorney fee award.

I

¶ 5. The Stuarts hired WSGI to remodel and to put an addition onto their home in Brookfield, Wisconsin. Weisflog is the president of WSGI, a home building and remodeling company. In 1995, the Stuarts met with Weisflog to discuss their project. The Stuarts claim that

110

Weisflog promised them that, for an architectural fee of $1,000, he would provide them with a design and final drawings for the remodeling and for the addition. Robert Stuart testified at trial that Weisflog promised him "independent architectural service[s]." In addition, Weisflog stated that he understood Brookfield building codes and regulations, and that he would comply with them. The Stuarts signed a "Remodeling Architectural Contract" (Architectural Contract) encompassing this agreement.[5] Neither Weisflog nor his son, Robert, who was the project manager, was a licensed architect. Furthermore, no outside architects were retained for the project. This claimed misrepresentation that the Stuarts would receive "Architectural" services, when the services of an architect were not provided, is one of the bases for the Stuarts' HIPA and negligence claims. In May 1996, after receiving the drawings, the Stuarts entered into a second contract for the remodeling and for the construction of their home addition (Remodeling Contract), which called for a total payment of $278,000.

¶ 6. In support of the Stuarts' misrepresentation claims, Robert Stuart testified at trial that Weisflog had promised the Stuarts that the products Weisflog would use on their project were high quality, that he was familiar with and understood the local building codes and regulations, and that "he could provide architectural service" for the Stuarts, which included doing the "architectural design work."[6] However, in contrast to

---

[5] In answer to a special verdict question, the jury found that WSGI made false, deceptive, or misleading representations in order to induce the Stuarts to enter into the remodeling architectural contract or for payment under said contract.

[6] Contrary to the concurrence/dissent's assertion, these statements show that Weisflog made misrepresentations on

Weisflog's representations, the Stuarts highlighted at trial the poor quality of the services and products they had received, and also emphasized Ronald and Robert Weisflog's admissions at trial about their lack of familiarity with local building codes and regulations. For example, at trial, Ronald Weisflog admitted he was not familiar with certain relevant portions of the City of Brookfield's building code.[7] Furthermore, Robert Weisflog testified he was not even aware that Brookfield had a building code.

¶ 7.   Under Robert Weisflog's direction, WSGI remodeled the home and built the addition, which included a room containing a hot tub. In 2001, Robert

_____

behalf of WSGI about his then existing qualifications, knowledge, and abilities, not just about future performance, in regard to the Remodeling Contract. Concurrence/Dissent, ¶¶ 67–76. For example, his assertion that he understood Brookfield codes and regulations very well was exactly such a present misrepresentation given his later admissions at trial to the contrary. He could not comply with building codes that he was not aware of, and this was a present misrepresentation. Accordingly, the record reflects that Weisflog and WSGI made present misrepresentations in regard to both the Architectural Contract and the Remodeling Contract. Indeed, the jury answered "yes" when asked whether the remodeling contractor or its agents made false, deceptive, or misleading representations that the remodeling work would comply with the building codes. The jury further found that this was a cause of damages to the Stuarts.

[7] A good example was Ronald Weisflog's admission at trial that he was unaware of the local building code for properly exhausting dryer vents. The improperly-exhausted dryer vent was linked by the Stuarts' engineer/home inspector to the later mold growth and lint accumulation in the Stuarts' attic. We note, again, that the jury found that the remodeling contractor or its agents made false, deceptive, or misleading representations that the remodeling work would comply with the building codes.

Stuart stepped through the floor of the hot tub room. When he lifted up the carpet in that room, he discovered that the floor had rotted through. The Stuarts then hired an engineer/home inspector who found many other serious construction defects and building code violations.

¶ 8. In April 2003, approximately two years after the Stuarts discovered the problems and approximately seven years after construction commenced, the Stuarts filed this lawsuit. In the various versions of their complaint, the Stuarts initially alleged negligence in design and construction, breach of contract, and the HIPA violations by virtue of the claimed misrepresentations made by WSGI and Weisflog. However, just before the trial began, the Stuarts dismissed their breach of contract claims.

¶ 9. At trial, the Stuarts presented the testimony of an architect who stated that WSGI's plans were deficient in multiple respects, including their nonconformance with applicable building codes. The Stuarts also introduced the report of their engineer/home inspector that discussed many deficiencies in the construction. The report concluded that some of these deficiencies stemmed from the nonconformance of the plans and some resulted from the actual construction. The report also concluded that the hot tub room had to be demolished and rebuilt, which was an assessment that WSGI's expert at trial was forced to concede. The total cost to repair the faulty project was estimated to be about $96,000.

II

¶ 10. We begin with a discussion of our standards of review. Determining the appropriate statutes of limitations to apply to the HIPA violations and to the

negligence claims are questions of statutory and administrative regulation construction that are subject to our de novo review. *DaimlerChrysler v. LIRC,* 2007 WI 15, ¶ 10, 299 Wis. 2d 1, 727 N.W.2d 311.

¶ 11. When determining whether Wis. Stat. § 100.20(5) authorizes the doubling of an entire damage award, even if a HIPA violation is combined with additional wrongdoing that contributes to the loss in question, we apply the same standard of review as we do for other issues of statutory construction. We must give effect to statutory enactments by determining the statute's meaning, especially through its language, which we presume expresses the intent of the legislature. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. We favor a construction that will fulfill the intent of a statute or a regulation, over a construction that defeats its manifest object. *Shands v. Castrovinci,* 115 Wis. 2d 352, 356, 340 N.W.2d 506 (1983). However, for questions of statutory construction, such as this one, our review is de novo. *DOR v. River City Refuse Removal, Inc.,* 2007 WI 27, ¶ 26, 299 Wis. 2d 561, 729 N.W.2d 396. Administrative rules or regulations are to be construed in the same manner as are statutes. *Baierl v. McTaggart,* 2001 WI 107, ¶ 21, 245 Wis. 2d 632, 629 N.W.2d 277. We utilize an identical standard of review in determining whether a corporate employee may be held personally liable for the acts, he or she takes on behalf of the corporate entity that employs him or her, that violate the HIPA, since that issue also involves the interpretation of statutes and administrative regulations.

¶ 12. In determining whether the circuit court erred by asking the jury to apportion damages between

the HIPA and the negligence claims, we start with the requirement that a special verdict must cover all material issues of ultimate fact. Wis. Stat. § 805.12. However, the content of the special verdict remains within the discretion of the circuit court, and this court will not interfere with the special verdict submitted, so long as all material issues of fact are covered by appropriate questions, *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 445–46, 280 N.W.2d 156 (1979), and so long as the form correctly and adequately covers the law that applies to the case. *Vogel v. Grant-Lafayette Elec. Coop.,* 201 Wis. 2d 416, 422, 548 N.W.2d 829 (1996).

¶ 13. We are satisfied that the ELD cannot apply to bar statutory claims, including those under HIPA, because of public policy issues that we discuss herein. When reviewing whether the ELD applies to bar the negligence claims of the respondents, we will determine whether the contracts in question are predominantly for services or for products, and then must apply the ELD to the relevant set of facts. *Linden v. Cascade Stone Co.,* 2005 WI 113, ¶¶ 8, 22, 283 Wis. 2d 606, 699 N.W.2d 189. *See also Ins. Co. of N. Am. v. Cease Elec., Inc.,* 2004 WI 139, ¶¶ 14, 15, 276 Wis. 2d 361, 688 N.W.2d 462. Both of these determinations are questions of law that remain subject to our independent review. *Ins. Co. of N. Am.,* 276 Wis. 2d 361, ¶¶ 14, 15.

¶ 14. Whether the circuit court erred in its determination on the amount of the attorney fee award to the Stuarts is subject to a different standard of review. Unless the circuit court erroneously exercised its discretion, the amount of an attorney fee award typically is left to the discretion of the circuit court, given that court's greater familiarity with the locality's billing norms and its firsthand opportunity to witness the

115

quality of the attorney's representation. *Kolupar v. Wilde Pontiac Cadillac, Inc.,* 2004 WI 112, ¶ 22, 275 Wis. 2d 1, 683 N.W.2d 58 (*Kolupar I*); *see also Kolupar v. Wilde Pontiac Cadillac, Inc.,* 2007 WI 98, ¶ 15, 303 Wis. 2d 258, 735 N.W.2d 93 (*Kolupar II*); *Anderson v. MSI Preferred Ins. Co.,* 2005 WI 62, ¶ 19, 281 Wis. 2d 66, 697 N.W.2d 73. However, we may examine the circuit court's explanation to determine whether the court employed a logical rationale that was based on the appropriate legal principles and on the facts in the record. *Id.*

## III. STATUTE OF LIMITATIONS

¶ 15. On review, Weisflog and WSGI argue that the Stuarts' HIPA claims and their negligence claims were barred by the six-year statute of limitations set forth in Wis. Stat. § 893.43, which is applicable to contract actions, under the premise that the Stuarts' claims actually were claims based on the breach of both contracts. Weisflog and WSGI claim that the HIPA merely adds penalty provisions to the breach of contract claims and that, as a result, the contract statute of limitations should apply to the HIPA claims. On review, the Stuarts argue that their HIPA claims, in addition to their claims for negligent design and construction, are independent claims similar to tort claims, which are governed by the discovery rule.

¶ 16. This court first adopted the discovery rule in *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 559, 335 N.W.2d 578 (1983). In *Hansen,* we stated that it would be "manifestly unjust for the statute of limitations to begin to run before a claimant could reasonably become aware of the injury." *Id.* We noted that "as a practical matter a claim cannot be enforced until the claimant discovers the injury and the accompanying right of

action." *Id.* Without the discovery rule, there could be instances where claims would be time barred before a harm was, or even could be, discovered, which would make it impossible for an injured party to seek redress. *Id.* As we noted, this would punish victims who were blameless for the delay and would benefit many wrong-doers by barring such meritorious claims. *Id.* We held "that the injustice of barring meritorious claims before the claimant knows of the injury outweighs the threat of stale or fraudulent claims." *Id.* As a result, we concluded that the discovery rule applied to "all tort actions other than those already governed by a legisla-tively created discovery rule." *Id.* at 560. Finally, we held that "[s]uch tort claims shall accrue on the date the injury is discovered[,] or with reasonable diligence should be discovered, whichever occurs first." *Id.* We later extended the discovery rule to hold that a claim did not accrue until the cause of the injury was discov-ered. *Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 335, 565 N.W.2d 94 (1997).

¶ 17. We are satisfied that none of the Stuarts' claims are barred by a statute of limitations. The Stuarts' HIPA claims and their negligence claims are governed by the discovery rule. We hold that the Stuarts' harm was of the type that the HIPA was intended to prevent, the Stuarts were within the class of persons that the HIPA was enacted to protect, that there was a clearly expressed legislative intent that the HIPA provide a basis for the imposition of civil liability, and that, accordingly, violations of HIPA provisions constitute a basis for the imposition of civil liability separate and apart from any breach of contract claims. *See generally Taft v. Derricks,* 2000 WI App 103, ¶¶ 2, 12, 235 Wis. 2d 22, 613 N.W.2d 190. As a result, we apply the discovery rule to the Stuarts' claims. *Id.*

¶ 18. We hold that Wis. Stat. § 893.93(1)(b) is the applicable statute of limitations given the allegations of fraud and misrepresentation upon which the Stuarts' claims, including both their HIPA and negligence claims, are based. The relevant statute reads: "An action for relief on the ground of fraud. The cause of action in such case[s] is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud." Wis. Stat. § 893.93(1)(b).

¶ 19. Applying the discovery rule and Wis. Stat. § 893.93(1)(b), we are satisfied that, as a matter of law, the Stuarts timely filed their claims. Discovery by the Stuarts of the facts could have occurred no earlier than when Robert Stuart's foot went through the floor of the hot tub room in the fall of 2001. The Stuarts filed their claims on April 11, 2003, which was less than two years after the discovery of the facts in 2001. The filing date was well within the six-year statute of limitations prescribed by § 893.93(1)(b). Accordingly, none of the Stuarts' claims are barred by the statute of limitations.

## IV. DAMAGES

¶ 20. The petitioners argue that double damages should be assessed only on the amount of the damages that the jury apportioned to HIPA violations, and not to the portion of the pecuniary loss attributed to negligent construction and design. In contrast, the Stuarts argue that their entire pecuniary loss should be doubled because that result would preserve the remedial nature of the important consumer protections encompassed in the HIPA.

¶ 21.   Given the facts of the present case, we hold that the HIPA should be applied to require the petitioners to pay double damages on the Stuarts' entire pecuniary loss, even though the Stuarts alleged other, non-HIPA, claims. While the HIPA is silent on whether the doubling of damages applies to the entire amount of the pecuniary loss when other conduct by the contractor contributes to the loss, remedial statutes must be liberally construed to advance the remedy that the legislature intended to be afforded. *Benkoski v. Flood,* 2001 WI App 84, 242 Wis. 2d 652, 626 N.W.2d 851.

¶ 22.   In *Benkoski,* a case in which the court of appeals addressed the question of double damages, the court held that a mobile home owner (Benkoski) should receive damages in the amount of twice the sales price of the mobile home, twice the advertising expenses Benkoski incurred, and an attorney fee award when the mobile home park's owner violated Wis. Admin. Codes §§ ATCP 125.06 and 125.09, and Wis. Stat. § 710.15, by adding an unreasonable restriction on the sale of the mobile home. *Benkoski,* 242 Wis. 2d 652, ¶¶ 1–3. The mobile home park's owner had added a condition to Benkoski's mobile home park lot lease that a future purchaser would have to remove the mobile home from the park at the end of the lease when Benkoski sold the mobile home. *Id.* The court of appeals held that the remedy of double damages was appropriate because it would: 1) encourage those who were injured by unfair trade practices that violated administrative regulations to bring suit; 2) encourage individuals to become "private attorney generals" in enforcing their own rights, with the aggregate effect operating to enforce the rights of the public; 3) deter impermissible conduct that violated administrative regulations by subjecting viola-

119

tors to double damages, an attorney fee award, and costs; and 4) augment the Wisconsin Department of Justice's enforcement of administrative regulations. *Id.*, ¶ 17.

¶ 23.   We agree with the statement of the court of appeals in the matter before us that "double damages and attorney fees help dispel the reluctance of parties injured by unfair trade practices to bring forward their causes of action and help deter similar and future contractor malfeasance, with the aggregate effect of working to the public good." *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2006 WI App 109, ¶ 48, 293 Wis. 2d 668, 721 N.W.2d 127 (citation omitted). In such cases, the entire pecuniary loss should be doubled for HIPA violations. Double damages are an available remedy for HIPA violations, given that the clear language of Wis. Stat. § 100.20(5) allows for the recovery of "twice the amount of such pecuniary loss . . . ." Wis. Stat. § 100.20(5).

¶ 24.   Furthermore, in the present case, the Stuarts' entire pecuniary loss was suffered because of the petitioners' HIPA violations, namely the initial misrepresentations, upon which the Stuarts relied in entering into both contracts. A clear causal connection exists between the Stuarts' entire pecuniary loss and the HIPA violations. That connection is certainly within the statutory language that a person must suffer a "pecuniary loss because of a violation . . . ." Wis. Stat. § 100.20(5). The present case meets the HIPA requirement of a seller making a misrepresentation "to induce any person to enter into a home improvement contract . . . ." Wis. Admin. Code § ATCP 110.02(11). Petitioners made their misrepresentations out "of their own volition and design . . . ." *Rayner v. Reeves Custom*

120

*Builders, Inc.*, 2004 WI App 231, ¶ 15, 277 Wis. 2d 535, 545, 691 N.W.2d 705. Accordingly, a doubling of the Stuarts' entire pecuniary loss is appropriate in the present case given the facts in this record. Upon remand, the circuit court should double the damages based upon the entire pecuniary loss for the reasons stated herein.

## V. APPORTIONMENT

¶ 25.   Over the Stuarts' objection and at the petitioners' request, the circuit court submitted a question to the jury asking the jury to apportion the Stuarts' damages between those damages caused by WSGI's negligent design and construction and those damages caused by WSGI's misrepresentations that were actionable under the HIPA. Specifically, the parties disagreed over the inclusion of Question 16B of the special verdict submitted to the jury. Question 16B read as follows: "Taking 100 percent as a total amount of damages, what percentage of the amount you placed in answer 16A[8] do you attribute to:   Misrepresentation ___% Negligence in construction ___% Total 100%."

¶ 26.   The jury found WSGI liable under both the negligence claims and the HIPA claims. After determining the Stuarts' damages to be $95,000, the jury apportioned 75 percent of the damages to the negligence claims and 25 percent of the damages to the HIPA misrepresentation claims.

¶ 27.   The Stuarts filed a postverdict motion in the circuit court arguing that the inclusion of Question 16B was erroneous. The circuit court denied that motion.

----

[8] Question 16A read: "What sum of money, if any, will fairly and reasonably compensate Robert and Lin Stuart for damages resulting from the negligence of the defendant(s)?" The jury answered this question with a figure of $95,000.00.

Before the court of appeals, the Stuarts once again argued that the circuit court erred by submitting the apportionment question to the jury because doing so frustrated the public policy behind the HIPA. The court of appeals agreed and, therefore, reversed the circuit court. The Stuarts continue to make that argument to this court.

¶ 28.   We hold that the circuit court erred by having the jury apportion damages between the negligence claims and the HIPA claims. The circuit court's special verdict, particularly Question 16B, was not consistent with the law. The HIPA was intended to curb unscrupulous business tactics that cause financial distress to both consumers and to persons engaged in legitimate businesses. *See generally Benkoski,* 242 Wis. 2d 652, ¶ 17.

¶ 29.   There is no place in this remedial framework for the apportionment of damages when, as here, the Stuarts' damages flowed from the petitioners' misrepresentations. Certainly, the misrepresentations were instrumental in causing the Stuarts to enter into the contracts.

¶ 30.   To obtain apportionment in lawsuits that contain HIPA claims, we hold that, before a party may request apportionment, it must meet the burden of showing that the damages can be separated.[9] The petitioners failed to do so in the present case. In cases such as the present one, where there is no clear way to

_____

[9] The concurrence/dissent argues that the jury had enough information to separate the negligent construction that occurred as a result of the erroneous specifications in the Weisflog-created plans from the negligent construction that occurred as a result of the builders not following the plans. Concurrence/Dissent, ¶ 98. Our review of the record does not

apportion the Stuarts' pecuniary loss between negligence damages and HIPA damages, doubling the entire pecuniary loss serves public policy concerns by encouraging victims to become "private attorney generals" and by providing larger disincentives to unscrupulous contractors.

¶ 31. There are additional reasons why apportionment is not appropriate in the present case. There was not enough evidence presented at trial for the jury to make a determination on apportionment, as demonstrated by the record. Furthermore, the circuit court did not instruct the jury on the apportionment issue.[10] Accordingly, we are satisfied that the jury did not have enough information or instruction, as a matter of law, to apportion damages between the Stuarts' negligent design and construction claims and their HIPA claims. We are satisfied that if, as here, the party requesting apportionment fails to meet its burden of providing sufficient evidence at trial to necessitate apportionment, that there should be no apportionment.[11]

support the concurrence/dissent's assertion that the jury had enough information to draw such distinctions.

[10] The record reflects that the circuit court judge read Question 16, including Question 16B, to the jury. The record also reflects that the judge read only standard jury instructions to the jury on negligence, contractors' negligence, damages, and causation. The only explanation the judge gave to the jury on Question 16 specifically was that it was a damage question and then stated, "You must answer the damage questions no matter how you answered any of the previous questions in the verdicts. The amount of damages, if any, found by you, should in no way be influenced or be affected by any of your previous answers to questions in the verdict." The judge then continued by reading standard jury instructions on damages, proof of damages, ATCP 110 claims, misrepresentation, and negligent misrepresentation.

[11] The concurrence/dissent misconstrues our reasoning as

## VI. ECONOMIC LOSS DOCTRINE

¶ 32.  On review, the petitioners argue that the Stuarts' claims were barred by the ELD, and the petitioners urge this court to apply the "predominant purpose test," set forth in *Linden*. *Linden*, 283 Wis. 2d 606, ¶¶ 8, 22. Petitioners want this court to hold that the transactions here were primarily for the sale of goods used in construction and not for services. In contrast, the Stuarts argue that the ELD does not apply to bar their claims.

¶ 33.  We hold that the ELD is inapplicable to the Stuarts' claims, and, therefore, the ELD does not apply to bar those claims. If we were to apply the ELD to bar the HIPA claims, we would be ignoring the public policies that are the basis for the HIPA. We are satisfied that the ELD cannot apply to statutory claims, including those under HIPA, because of such public policies.[12] Whether or not the ELD applies to the Stuarts' non-HIPA negligence claims would be analyzed and determined using the predominant purpose test. In analyzing those claims in light of the predominant purpose test, we hold that the architectural contract, which was one for services,[13] was the core transaction from which the contract for the remodeling and for the addition

---

requiring a defendant to prove damages. Rather, we are placing the burden of proving that the evidence is of sufficient detail to allow for apportionment on a defendant who requests apportionment in an ATCP action. Concurrence/Dissent, ¶ 97.

[12] The ELD does not bar the statutory claims. Given the inability in the present case to apportion damages between the statutory and the common law claims, none of the Stuarts' claims should be barred by the ELD.

[13] In arguing that the Remodeling Contract was predominantly a contract for goods (products), the concurrence/dissent

flowed. That second contract also involved services, as well as some products. Given that the core contract was one for services, and given that both contracts involved services, we are satisfied that the transactions were primarily for services and that the ELD does not apply in the present case. The appropriate application of the predominant purpose test leads us to that result.

¶ 34. In our *Insurance Co. of North America v. Cease Electric* decision, we enunciated a "bright line rule" that the ELD is "inapplicable to claims for the negligent provision of services." *Ins. Co. of N. Am.*, 276 Wis. 2d 361, ¶ 52. Accordingly, we hold that the ELD is not applicable to the Stuarts' claims because there were two contracts, both involving services, and because the most significant one, applying the HIPA, was the first one for the provision of so-called architectural services by Weisflog and WSGI.[14] As we noted in *Linden*, economic damages for the purpose of the ELD "are those arising because the product does not perform as expected, including damage to the product itself or monetary losses caused by the product." *Linden*, 283 Wis. 2d 606, ¶ 6 (citation omitted). Here, the Stuarts' damages resulted from the HIPA violations and from the negli-

---

elevates form over substance by claiming that the contract is one for "drawings," as opposed to being a contract for the service of creating architectural designs and communicating those designs. Concurrence/Dissent, ¶ 106.

[14] While not controlling, we find helpful and illustrative the approach a Minnesota court used when faced with two separate contracts, one of which was for services and one of which was for goods. *See Minn. Forest Prods., Inc. v. Ligna Mach., Inc.*, 17 F. Supp. 2d 892 (D. Minn. 1998). That court refused to apply the predominant purpose test when faced with the existence of "two separate and distinct contracts," one of which was for the design of a sawmill and one of which was for the sale of sawmill equipment. *Id.* at 904.

gent design and construction practices of the petitioners, not from a failure of the construction supplies and products.[15] Accordingly, for this additional reason, we hold that the ELD is inapplicable to the Stuarts' claims.

¶ 35.   As noted previously, to apply the ELD to the HIPA claims would defeat the public policies underpinning the HIPA and the remedies it provides. Public policy concerns require consumer protection statutes and administrative regulations be read in pari materia to achieve the goals of providing consumers, as well as

---

[15] The report of the Stuarts' engineer/home inspector, Thomas Feiza, which the Stuarts presented at trial, is replete with examples of how the *architectural and design services* provided by WSGI and Weisflog were the *cause* of the rotting wood in the hot tub room, as opposed to deficient products.

The Stuarts' expert noted the following deficiencies in the hot tub room's design that led to the rotting wood: the plans for the hot tub room lacked appropriate specifications and details; the plans failed to specify the required pressure treated wood to discourage decay and termites; there was no ventilation in the unheated crawl space below the hot tub room; the sole exhaust fan in the hot tub room had no visible exterior discharge or termination; proper surface drainage was not specified; there was not slab on grade construction to prevent moisture problems with the wood framed flooring; there were no gutters on the hot tub room to drain water away from its foundation; the lack of a drain tile system; the use of a wood retaining strip instead of a metal retaining strip on the roof of the hot tub room, in contradiction to the manufacturer's specifications, which caused water to build up on the roof; the lack of crawl space access panels, as required by Brookfield building codes; and the lack of sufficient roof venting.

For the reasons discussed herein, this case is very different than the circumstances presented to us in the case of *1325 North Van Buren, LLC v. T-3 Group, Ltd.,* 2006 WI 94, 293 Wis. 2d 410, 716 N.W.2d 822, where the mixed contract was predominantly for a product, rather than for services.

persons engaged in legitimate businesses, with necessary protections and appropriate remedies. *Jackson v. DeWitt,* 224 Wis. 2d 877, 887, 592 N.W.2d 262 (Ct. App. 1999).

¶ 36.   In a case involving another unfair trade statute, our court of appeals held that the ELD did not apply to bar a claim under the "Fraudulent representations" statute, Wis. Stat. § 100.18. *See Kailin v. Armstrong,* 2002 WI App 70, 252 Wis. 2d 676, 643 N.W.2d 132. As the *Kailin* court noted, applying the ELD to HIPA claims would eliminate the consumer protection that the state legislature intended. *Id.*

¶ 37.   Furthermore, the HIPA gives no indication that the legislature merely intended to add a remedy to common-law breach of contract or misrepresentation claims. Accordingly, we hold that the ELD does not extend to HIPA claims, nor does it cover negligence claims such as the ones here that are the result of misrepresentations under the HIPA.

### VII. PERSONAL LIABILITY

¶ 38.   The parties disagreed over the special verdict that would be submitted to the jury on the issue of Ronald Weisflog's personal liability. The circuit court denied the Stuarts' request to include questions on the special verdict as to whether Weisflog should be held personally liable. The petitioners asserted that such questions should not be included based on their argument that personal liability should not result when an individual is acting only in his or her corporate business capacity.

¶ 39.   The court of appeals held that the circuit court erroneously refused to submit to the jury special verdict questions on whether Weisflog should be held

personally liable for the respondents' damages.[16] As a result, the court of appeals remanded that issue to the circuit court with instructions to hold a new trial on whether Weisflog should be held personally liable.

¶ 40.  The HIPA envisions that a person, such as Weisflog, may be personally liable given its plain language which reads: " 'Seller' means a *person* engaged in the business of making or selling home improvements and includes corporations, partnerships, associations and any other form of business organization or entity, and their *officers, representatives, agents and employees.*" Wis. Admin. Code § ATCP 110(5) (emphasis added). Furthermore, Wis. Stat. § 100.20(5) states: "Any person suffering pecuniary loss because of a violation *by any* other *person* of any order issued under this section may sue for damages therefore . . . and shall recover twice the amount of such pecuniary loss, together with costs, including a reasonable attorney's fee." (Emphasis added.)

¶ 41.  We hold that a corporate employee may be personally liable for acts, he or she takes on behalf of the corporate entity that employs him or her, that violate the HIPA. Accordingly, such violations may create personal liability for individuals who are alleged to be responsible for prohibited, unfair dealings and practices.[17] However, we note that merely being an officer, agent, employee, representative, shareholder, or director will not be enough to impose individual liability

---

[16] Contrary to the concurrence/dissent's assertion that "the Stuarts asked for no question that would have assigned personal liability to Ronald Weisflog for misrepresentation" (Concurrence/Dissent, ¶ 113), the Stuarts made exactly such a request in the Plaintiffs' Proposed Special Verdict, requests 12 through 14.

[17] Despite the argument of the petitioners, our previous jurisprudence in Americans with Disabilities Act (ADA) cases,

on a person in such a class in the absence of proof that he or she was personally responsible for prohibited, unfair dealings or practices.

¶ 42.   Furthermore, our decision today is in line with our prior jurisprudence in related areas of the law. As we have stated, "The general rule is that the agent, as well as the principal for whom he is acting[,] is responsible for the tortious acts of the agent." *Hanmer v. DILHR*, 92 Wis. 2d 90, 97, 284 N.W.2d 587 (1979) (citation omitted).[18] In another decision, we made it clear that this principle also applies to the tort of misrepresentation. *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis. 2d 683, 692–93, 273 N.W.2d 285 (1979) (holding a nonresident corporate officer personally liable for misrepresentations the officer "personally commit[ted] or participate[d] in" on behalf of the corporation while present in Wisconsin).

¶ 43.   We remand the case to the circuit court with instructions to hold a new trial on whether Ronald Weisflog should be held personally liable for the Stuarts' damages.

---

such as *Alberte v. Anew Health Care Services, Inc.*, 2000 WI 7, 232 Wis. 2d 587, 605 N.W.2d 515, is distinguishable given that Wis. Stat. § 100.20(5) and ATCP 110 clearly provide for individual liability for corporate employees who are wrongdoers, whereas the ADA does not contemplate such individual liability.

[18] In *Hanmer*, two business owners were held to have voluntarily terminated their own employment for unemployment compensation purposes when they decided the business should file for bankruptcy. *Hanmer v. DILHR*, 92 Wis. 2d 90, 95, 284 N.W.2d 587 (1979). We noted that the co-owners did not enjoy a legal status apart from the business entity they jointly owned for this purpose. *Id.* In so holding, we stated, "It is not now, nor has it ever been, the law in this state that such an individual escapes liability merely because he was acting in the capacity of a corporate director." *Id.* at 97.

## VIII. ATTORNEY FEES

¶ 44. On motions after the verdict, the circuit court awarded attorney fees in the amount of $15,675 to the Stuarts. The circuit court declined to hold a separate hearing on the determination of an attorney fee award. Instead, the circuit court reached that figure after it doubled the dollar value associated with the 25 percent of the damages that the jury attributed to the ATCP 110 violations, which made the ATCP 110 damages rise from $23,750 to $47,500. After doing so, the circuit court then reached its decision that the attorney fee award should be $15,675 by applying a 33 1/3 percent contingency fee to the damage amount of $47,500.

¶ 45. The Stuarts contend that the circuit court erred in using this methodology instead of correctly applying the lodestar methodology. The Stuarts had sought approximately $200,000 in attorney fees. In *Kolupar I,* this court adopted the lodestar methodology for determining reasonable attorney fees under fee shifting statutes and specifically directed "the circuit courts to follow its logic when explaining how a fee award has been determined." *See Kolupar,* 275 Wis. 2d 1, ¶ 30. In Anderson, we noted that "[u]nder this analysis, the circuit court must first multiply the reasonable hours expended by a reasonable rate .... The circuit court may then make adjustments using the SCR 20:1.5(a) factors." *Anderson,* 281 Wis. 2d 66, ¶ 39 (citations omitted); *see also Kolupar II,* 303 Wis. 2d 258, ¶ 15.

¶ 46. As noted above, the apportionment of damages between the Stuarts' negligence claims and their HIPA claims, upon which the amount of damages for the attorney fee award determination was based, was

erroneous. Furthermore, we are satisfied that the use of a percentage contingency fee instead of the lodestar methodology was an erroneous exercise of discretion by the circuit court given the facts of the present case.

¶ 47.   We remand this matter to the circuit court for a determination of what constitutes a reasonable attorney fee award in this case utilizing the lodestar methodology.

## IX

¶ 48.   We hold as follows on each of the six principal issues that we were asked to answer in this decision. First, we hold that the Stuarts' HIPA claims and their negligence claims are not barred by a statute of limitations because their claims are governed by the discovery rule and the six-year statute of limitations set forth in Wis. Stat. § 893.93(1)(b). Second, we are satisfied that Wis. Stat. § 100.20(5) authorizes the doubling of an entire damage award, even if a HIPA violation is combined with additional wrongdoing that contributes to the loss in question. Third, based on the evidence in the record and on the facts of the present case, we hold that the circuit court erred by asking the jury to apportion damages between the Stuarts' HIPA claims and their negligence claims. Fourth, we are satisfied that the ELD is inapplicable to the Stuarts' claims, and, therefore, does not bar their claims. Fifth, we hold that a corporate employee may be held personally liable for acts, he or she takes on behalf of the corporate entity that employs him or her, that violate the HIPA. Lastly, we hold that the circuit court erred in its determination of an appropriate attorney fee award.

¶ 49. The decision of the court of appeals is affirmed, and the cause is remanded to the circuit court for proceedings consistent with our decision.

*By the Court.*—Affirmed and remanded to the circuit court.

¶ 50. SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* I join the majority opinion except Part VI relating to the economic loss doctrine.

¶ 51. I agree with the majority opinion that the economic loss doctrine "cannot apply to bar statutory claims, including those under HIPA."[1] I do not join the majority opinion in addressing the question whether the economic loss doctrine bars the Stuarts' claims for negligent design or negligent construction. This discussion is not necessary to the holding in the present case.

¶ 52. I agree with the majority opinion in not responding to the concurrence/dissent that addresses and decides the instant case on whether the plaintiffs proved that the defendants made an actionable misrepresentation for purposes of the Home Improvement Practices Act (HIPA).[2] This issue was not raised or briefed.[3] The majority opinion properly leaves the issue untouched.

¶ 53. For the reasons set forth, I join the majority opinion except Part VI. I write separately on the issues of the economic loss doctrine and actionable misrepresentation.

¶ 54. PATIENCE DRAKE ROGGENSACK, J. *(concurring in part, dissenting in part).* The lawsuit before

---

[1] Majority op., ¶ 13.

[2] *See* concurrence/dissent, ¶¶ 66–81.

[3] The majority opinion correctly states the issues before the court at ¶ 3.

the court arises from the design and construction of an addition to the home of Robert Stuart and Lin Farquhar-Stuart (the Stuarts). Two types of claims were tried to a jury: (1) violation of Wisconsin Administrative Code § ATCP 110.02(11) (Oct. 2004)[1] (a provision of the Home Improvement Practices Act or HIPA) based on misrepresentation and (2) common law negligence in the design and construction of the addition. The Stuarts prevailed on both types of claims and the jury allocated damages between those claims.

¶ 55. Before us as part of this review are a potential application of the statute of limitations, which the defendants, Weisflog's Showroom Gallery, Inc. and Ronald Weisflog, raised as an affirmative defense[2] and; the court of appeals decision that the attorney fees awarded by the circuit court were determined by an incorrect process and must be recomputed.

¶ 56. The majority opinion concludes that the HIPA claim and the negligence claims are not barred by the statute of limitations and that the circuit court erred in its determination of an appropriate attorney fees award.[3] I concur to the majority opinion, in part, because I conclude that the statute of limitations does not bar either type of claim. I also conclude that if I were to assume that a HIPA violation were possible given the jury's factual findings in regard to what was represented, I would conclude that the Stuarts' HIPA claim would not be barred by the economic loss doctrine and that the analysis the circuit court used in determining the

---

[1] All further references to the Wisconsin Administrative Code are to the October 2004 version, unless otherwise noted.

[2] Neither the circuit court nor the court of appeals concluded that the affirmative defense was meritorious.

[3] Majority op., ¶ 4.

133

amount of attorney fees is inconsistent with the precedent established by *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, ¶¶ 23–30, 275 Wis. 2d 1, 683 N.W.2d 58. However, on remand, the circuit court should determine whether the Architectural Remodeling Contract is a "home improvement contract" as defined in Wis. Admin. Code § ATCP 110.01(4)[4] because under the lodestar method for determining attorney fees that we endorsed in *Kolupar,* the type of claim on which a litigant prevails is a factor for the circuit court's consideration. *Id.*, ¶ 30.

¶ 57. I dissent, in part, because I further conclude, contrary to the majority opinion, that the following five holdings should be this court's conclusions when the law is applied to those facts that were found by the jury: (1) the defendants' representations that they would design drawings and construct an addition to the Stuarts' home consistent with the building codes are not representations of a then existing or pre-existing fact and accordingly they cannot form the basis for a HIPA violation based on misrepresentation;[5] (2) assuming that a HIPA violation were possible given the jury's findings in regard to what was represented,

---

[4] No party in this review has argued that either the Remodeling Architectural Contract or the Remodeling Contract are not "home improvement contracts," so the majority opinion and I have assumed that they both are. However, "home improvement contract" has a specific definition in Wis. Admin. Code § ATCP 110.01(4). It covers contracts between a "seller" and a "buyer" to construct "home improvements." A "home improvement" is defined in § ATCP 110.01(2) as "the remodeling, altering, repairing, painting, or modernizing of residential or non-commercial property, or the making of additions thereto . . . ."

[5] However, as I explain below, they may form the basis for a breach of contract claim.

nothing in Wis. Admin. Code, ch. ATCP 110, nor in Wis. Stat. § 100.20(5) on which this HIPA claim is based, authorizes doubling the jury's award of damages for negligent construction, as well as those damages awarded for the HIPA violation; (3) assuming that a HIPA violation were possible given the jury's findings in regard to what was represented, the circuit court did not err by permitting the jury to allocate damages between the HIPA claim and the negligence claim because the Stuarts pled both types of claims, tried both types of claims and requested special verdict questions on both types of claims; (4) the economic loss doctrine bars the negligence claims that are based on negligent design and construction of the addition; and (5) the circuit court did not err in drafting Special Verdict Question 9, which placed Ronald Weisflog on the Special Verdict solely in regard to whether he was a principal in the Remodeling Contract because that is the only context in which he could have been personally liable under the evidence adduced at trial. Accordingly, I would reverse the decision of the court of appeals and remand the case to the circuit court to vacate the award of damages and attorney fees and dismiss the lawsuit.

## I. BACKGROUND[6]

¶ 58. The Stuarts wanted to enlarge their home. To this end, they had plans drawn by an unnamed builder for the addition they wanted. However, when the bids came in, the addition was out of their price range. Subsequently, the Stuarts heard of the Weisflog company, and in 1995, they met with Ronald Weisflog, the President of Weisflog's Showroom Gallery, Inc., to

---

[6] The facts in the "Background" are either those found by the jury in the Special Verdict or they are undisputed.

discuss their ideas for an addition. They gave Ronald Weisflog a check for $500 and he agreed to begin work on drawings to implement their ideas.

¶ 59.  Following several meetings with Ronald Weisflog, the Stuarts entered into a written contract entitled, "Remodeling Architectural Contract." This contract required the Stuarts to pay a "remodeling architectural fee" of $1,000 ten days after their approval of the finalized drawings for the addition. The Remodeling Architectural Contract also provided as follows:

> We understand that this remodeling architectural fee will be applied toward the construction costs of the remodeling project, after we sign a contract with Weisflog's Showroom Gallery, Inc., accepting this corporation as the remodelers of our future project.

¶ 60.  Both of the Stuarts signed the Remodeling Architectural Contract and Ronald Weisflog signed it as "President" of Weisflog's Showroom Gallery, Inc. The Stuarts understood that the $1,500 in fees paid under the Remodeling Architectural Contract entitled them to ownership of the plans once they were finalized and that they could take them to any builder for bids to do the actual construction.

¶ 61.  On April 21, 1996, the Stuarts entered into a second contract, entitled "Remodeling Contract," to construct the 2,000 square foot addition to their home.[7] The Remodeling Contract was in the amount of $278,076.96. It listed various types of materials that would be used in the construction of the addition to the Stuarts' home, room by room. On the last page, the Remodeling Contract showed $74,113 as "allowances"

---

[7] The addition doubled the size of the Stuart's home, and also created an outdoor in-ground swimming pool with surrounding deck.

for various types of products, such as cabinets, carpet and appliances, wherein the contract price could vary if the Stuarts selected more or less expensive products than provided for in the allowances. Robert Weisflog,[8] Ronald's son, signed the contract, without any designation that he was signing on behalf of Weisflog's Showroom Gallery, Inc.

¶ 62.   The Stuarts commenced this action alleging negligence in the design and construction of their home addition and breach of contract. They later amended the complaint to allege they were damaged because of HIPA violations under Wis. Admin. Code § ATCP 110.02(11) based on alleged misrepresentations. Before trial, the Stuarts dismissed their breach of contract claims and proceeded on the alleged HIPA violations and claims of common law negligence in the design and construction of the addition.

¶ 63.   The jury was the fact finder for the Stuarts' claims. Therefore, the Special Verdict answers are critical to a correct application of the relevant law.

## II. DISCUSSION

A. Standard of Review

¶ 64.   Resolution of four of the five issues that I will address[9] proceed before this court as questions of law wherein we provide an independent review, but benefiting from the analyses of previous court decisions. *State v. Cole,* 2003 WI 59, ¶ 12, 262 Wis. 2d 167, 663 N.W.2d 700. Whether a representation is sufficient

---

[8] Robert Weisflog has never been a defendant in the Stuarts' lawsuit.

[9] I do not address the standard of review for issues that I do not discuss in this opinion.

to form a legally actionable misrepresentation is a question of law. *Loula v. Snap-On Tools Corp.*, 175 Wis. 2d 50, 54, 498 N.W.2d 866 (Ct. App. 1993). The interpretation and application of statutes are questions of law, *Minuteman, Inc. v. Alexander,* 147 Wis. 2d 842, 853, 434 N.W.2d 773 (1989), as are the interpretation and application of administrative rules, *Snyder v. Badgerland Mobile Homes, Inc.,* 2003 WI App 49, ¶ 10, 260 Wis. 2d 770, 659 N.W.2d 887. Whether the economic loss doctrine applies either to a particular type of claim or to a particular fact set presents a question of law. *See Kaloti Enters., Inc. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 10, 283 Wis. 2d 555, 699 N.W.2d 205; *Kailin v. Armstrong,* 2002 WI App 70, ¶ 43, 252 Wis. 2d 676, 643 N.W.2d 132.

¶ 65. However, the form of a special verdict is committed to the discretion of the circuit court. *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 445, 280 N.W.2d 156 (1979). Accordingly, I review the Special Verdict to determine whether the circuit court erroneously exercised its discretion in the questions relating to the apportionment of damages. *Ford Motor Co. v.* Lyons, 137 Wis. 2d 397, 465, 405 N.W.2d 354 (Ct. App. 1987).

B. Misrepresentation

¶ 66. All of the Stuarts' HIPA claims are based on alleged misrepresentations. Therefore, an understanding of the legal principles that underlie an actionable claim of misrepresentation is essential to my discussion of their HIPA claims.

1. General principles

¶ 67. Not every representation that turns out to be untrue is a legally actionable misrepresentation. For example, to maintain a claim of misrepresentation, the

Stuarts must allege and prove that the defendants made a representation of a fact that was untrue at the time when the representation was made. *Consol. Papers, Inc. v. Dorr-Oliver, Inc.*, 153 Wis. 2d 589, 594, 451 N.W.2d 456 (Ct. App. 1989) (concluding that Dorr-Oliver's representation that the clarifier it will construct will meet the specific operating requirements of Consolidated Papers was not actionable as a misrepresentation, even though the clarifier that was built did not comply with Consolidated Papers' specific operating requirements). Representations that are promises of future performance are not actionable as misrepresentations, unless the person promising future performance had no intention of carrying out that promise at the time he made it. *Id.*

¶ 68. In addition, exaggerations or statements of opinion that a seller makes claiming that his product is the best or that the quality of his work is the finest are mere "puffery"; and therefore, they are legally insufficient to support a claim for misrepresentation. *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 41, 270 Wis. 2d 146, 677 N.W.2d 233 (concluding that Harley-Davidson's advertising its TC-88 motorcycle as a "masterpiece" and of "premium quality" were legally insufficient to support a claim of misrepresentation). As we have explained, "[T]he exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined," are not actionable misrepresentations under the law. *State v. Am. TV & Appliance of Madison, Inc.*, 146 Wis. 2d 292, 301–02, 430 N.W.2d 709 (1988) (concluding that American TV's representation that its washing machines were the "best" or the "finest" were insufficient representations to violate Wis. Stat. § 100.18, as a matter of law). Stated otherwise, com-

mercial puffery is not within the ambit of legally actionable misrepresentation because it is the opinion of the speaker and "not capable of being substantiated or refuted." *Tietsworth,* 270 Wis. 2d 146, ¶ 44; *see also In re Sterling Drug, Inc.,* 102 F.T.C. 395 (1983) (concluding that Bayer's representation that it produced "the world's best aspirin" was lawful puffery).

2. The jury's findings

¶ 69. The jury found for the Stuarts on two misrepresentation claims, one for each of the two contracts to which the Stuarts were parties. First, the jury found that in order to induce the Stuarts to enter into the Remodeling Architectural Contract or to keep any payment under the Remodeling Architectural Contract, Weisflog's Showroom Gallery, Inc. made a representation that was false deceptive or misleading.[10] The jury did not identify the specific representation that was made. Second, the jury found that in order to induce the Stuarts to enter into the Remodeling Contract, Weisflog's Showroom Gallery, Inc. made only one representation: that construction of the addition "*will comply with the building codes.*"[11] Therefore, the majority opinion's examination of the HIPA claims, which rest on the misrepresentation findings of the jury, should rest

---

[10] The Special Verdict submitted to the jury provided:

1. Did Weisflog Showroom Gallery, Inc., make any false, deceptive, or misleading representations in order to induce the Plaintiffs, Robert & Lin Stuart to enter into a remodeling architecture contract, or to obtain or keep any payment under the remodeling architecture contract?

ANSWER: Yes.

[11] The Special Verdict submitted to the jury provided:

13. Did the remodeling contractor or its agents make false, deceptive or misleading representations that remodeling work will

solely on the representation that the addition "will comply with the building codes" because that is what the jury found.

¶ 70.  Before us, the Stuarts do not argue that the jury should have been asked whether the "remodeling contractor" made any additional false, deceptive or misleading representations other than those assuring that the future construction will comply with the building codes when finished. Therefore, their sole HIPA claim in regard to the Remodeling Contract is that the "remodeling contractor" said the addition will be constructed in compliance with the building codes.

¶ 71.  Third, the jury found that Weisflog's Showroom Gallery, Inc. and Ronald Weisflog *did not* represent that they were licensed architects.[12] This negative finding was a rejection of one basis for the Stuarts' HIPA claim that, contrary to Wis. Admin. Code § ATCP 110.02(4)(d), the defendants had represented they were licensed architects when they were not. The Stuarts do

---

comply with the building codes in order to induce the Plaintiffs Robert and Lin Stuart to enter the remodeling contract?

ANSWER: Yes.

[12] The Special Verdict Form provided the following questions and answers in this regard:

4. Did Weisflog Showroom Gallery, Inc. misrepresent that they were licensed architects?

ANSWER: No.

If you answered Question 4, "yes", then answer this question:

5. Did the Stuarts rely on the misrepresentation?

ANSWER: N/A.

If you answered Question No. 5, "yes", then answer this question:

6. Was such misrepresentation a cause of damages to the Stuarts?

ANSWER: N/A.

not contest this finding or argue that Special Verdict Question No. 4 was improperly framed.

¶ 72. Fourth, because it was the Stuarts' position at trial that the remodeling contract was with Ronald Weisflog in his personal, not corporate, capacity, Special Verdict Questions Nos. 9 and 10 addressed this issue.[13] Question No. 9 asked "Who did the Stuarts have a remodeling contract with? Ronald Weisflog as [an] individual, or [with] Weisflog Showroom Gallery, Inc.?" The jury answered that question, "Weisflog Showroom Gallery, Inc."

¶ 73. Fifth, Question No. 16 asked the jury to find the total damages the Stuarts suffered and then to apportion the damages between the HIPA misrepresentation claim and the common law claim for negligent construction.[14] The jury found that the total amount of damages resulting from the negligence of the defen-

---

[13] The Special Verdict submitted to the jury provided:

9. Who did the Stuarts have a remodeling contract with?

    A. Ronald Weisflog as individual?

OR

    B. Weisflog Showroom Gallery, Inc.

ANSWER: Weisflog Showroom Gallery, Inc.

If you selected 9A only, then answer question No. 10.

10. Did a party other than Ronald Weisflog act as general contractor or assume responsibility for the performance of the remodeling contract?

ANSWER: N/A.

[14] The Special Verdict submitted to the jury provided:

Regardless of how you have answered any of the previous questions, you must answer these questions.

dants was $95,000. It also found that 25% of the Stuarts' damages were due to misrepresentation and 75% were due to negligence in construction of the addition. The jury did not assign any damages for negligence in design.

### 3. Lack of present or pre-existing facts

¶ 74. All of the representations that the jury found were made to induce the Stuarts to enter into each of the two contracts were promises of future performance.[15] Ronald Weisflog never disputed that he represented that he would create drawings for the addition that "will comply" with the building codes and that the addition Weisflog's Showroom Gallery, Inc. contracted to construct also "will comply" with the building codes.

¶ 75. However, the majority opinion's analysis gets off track in at least three respects: (1) it does not

---

16A. What sum of money, if any, will fairly and reasonably compensate Robert and Lin Stuart for damages resulting from the negligence of the defendant(s)?

ANSWER: $95,000.00.

16B. Taking 100 percent as a total amount of damages, what percentage of the amount you placed in answer 16A do you attribute to:

| | |
|---|---|
| Misrepresentation | 25% |
| Negligence in construction | 75% |
| Total | 100% |

[15] If the jury had found that Weisflog Showroom Gallery, Inc. and Ronald Weisflog had represented they were licensed architects, that would have been the representation of a fact then in existence. However, the Stuarts did not prevail on that allegation.

acknowledge that promises of future performance are not actionable as misrepresentations, *Consolidated Papers,* 153 Wis. 2d at 594; (2) it does not acknowledge that representations about the quality of a product or a service by the seller are not actionable as misrepresentations, *Tietsworth,* 270 Wis. 2d 146, ¶ 41; and (3) it does not acknowledge that the only facts that can underlie its opinion are those that the jury found in the Special Verdict, i.e., we are not free to add facts inconsistent with those found by the jury in order to support a position. *Wurtz v. Fleischman,* 97 Wis. 2d 100, 108, 293 N.W.2d 155 (1980). The facts found by the jury show only representations of acts to be accomplished in the future.

¶ 76.  The majority opinion repeatedly supports its opinion with facts that the jury did not find. For example, the majority opinion says, "Ronald Weisflog had promised the Stuarts that the products he would use on their project were high quality, that he was familiar with and understood the local building codes and regulations, and that 'he could provide architectural service' for the Stuarts, which included doing the 'architectural design work.' "[16] However, the jury did not find that Ronald Weisflog represented that he "was familiar" with the building codes when he was not.

_____

[16] Majority op., ¶ 6. Note 5 to ¶ 6 elaborates that Ronald Weisflog's "assertion that he understood Brookfield codes and regulations very well was exactly such a present misrepresentation given his later admissions at trial to the contrary." However, the jury made no finding that Ronald Weisflog represented that "he understood Brookfield codes and regulations very well" when he did not. We are not the finders of fact in an appellate review and therefore, we are not free to supplement the facts found by the jury to support our conclusions. *See Wurtz v. Fleischman,* 97 Wis. 2d 100, 108, 293 N.W.2d 155 (1980).

Instead, the jury found he represented "that remodeling work *will comply* with the building codes." Special Verdict Question No. 13 (emphasis added). The jury's finding is a promise of future performance, not a representation of a fact in existence when the representation was made. Therefore, it cannot form the basis for a misrepresentation claim. *Consol. Papers,* 153 Wis. 2d at 594.

¶ 77.   In addition, the jury made no finding that the defendants represented the quality of their products or services; nor should it have done so, as a representation of quality is not actionable as a misrepresentation. *Tietsworth,* 270 Wis. 2d 146, ¶ 41. In this regard, the majority mistakes mere puffery for an actionable misrepresentation. For example, it relates, "Ronald Weisflog had promised the Stuarts that the products he would use on their project were high quality . . . ."[17] However, the jury made no such finding of fact. Furthermore, as we recently explained in *Tietsworth,* where another statutory claim of misrepresentation was made, "the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined" are not actionable as misrepresentations. *Id.* (quoting *Am. TV,* 146 Wis. 2d at 301–02).

¶ 78.   And finally, the majority opinion ignores the jury's specific finding that Weisflog's Showroom Gallery, Inc. and Ronald Weisflog did not represent that they were licensed architects. Special Verdict No. 4. We are not free to add to or to ignore the Special Verdict.

---

[17] Majority op., ¶ 6. This contention could have relevance only to the Remodeling Architectural Contract because the only representation the jury found was false, deceptive or misleading in regard to the Remodeling Contract was the representation that the construction of the addition "will comply" with the building codes.

Accordingly, no misrepresentation claim under HIPA was proved by the Stuarts. No damages are due for misrepresentation under HIPA and no attorney fees should be awarded based on a proved HIPA violation.[18]

¶ 79. The case before us is a civil action. However, I am particularly concerned with the majority opinion's broadening the definition of a legally actionable representation to include promises of future performance because violations of Wis. Admin. Code ch. ATCP 110 may be prosecuted as crimes, under Wis. Stat. § 100.26(3). *State v. Stepniewski,* 105 Wis. 2d 261, 262–63, 314 N.W.2d 98 (1982) (concluding that a criminal prosecution under § 100.26(3) for violations of ch. ATCP 110 does not require proof of intentional conduct).

¶ 80. The definition of "representation" that the court chooses to apply to § ATCP 110.02(11) in the case at bar will be the same definition that will apply when violations of § ATCP 110.02(11) are prosecuted criminally. Therefore, subsequent to the court's decision in this case, a plumber who tells a homeowner that he will properly install a toilet but does not do so, or a general contractor who tells a homeowner that he will comply with the building code in the remodeling of a residence but then a subcontractor does not adhere to the relevant codes, could be subject to criminal prosecution under § 100.26(3) for failing to keep those promises of future performance.

---

[18] However, it should not be assumed that, because the defendants' representation that the design and construction of the addition will comply with the building codes is not an actionable misrepresentation, the defendants are relieved of their legal duty to fulfill the promise they made. Failure to keep a promise of future performance is actionable as a breach of contract. *Eli Envtl. Contractors, Inc. v. 435 Partners, LLC,* 2007 WI App 119, ¶ 6, 300 Wis. 2d 712, 731 N.W.2d 354.

¶ 81.  Breach of contract damages to compensate the homeowner for shoddy workmanship have been a sufficient remedy in the past. However, because the majority opinion defines promises of future performance as actionable representations when those promises are not fulfilled, the law will change. That change will place an unwarranted burden of possible criminal prosecution on the building trades. It will have far-reaching impacts throughout Wisconsin, which the majority opinion appears not fully to appreciate.

## C. Wisconsin Stat. § 100.20(5)

### 1. Double damages

¶ 82.  The majority opinion concludes that both the damages sustained by the Stuarts for misrepresentation and the damages they sustained due to negligent construction should be doubled under the provisions of Wis. Stat. § 100.20(5).[19] The majority opinion reaches this conclusion because it finds that a "clear causal connection exists between the Stuarts' entire pecuniary loss and the HIPA violations."[20]

¶ 83.  The majority opinion's conclusion is erroneous for at least two reasons:   First, causation is a jury question, *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.*, 2007 WI 70, ¶¶ 38–39, 301 Wis. 2d 109, 732 N.W.2d 792, and the jury made no finding of a causal connection between the Stuarts' entire pecuniary loss and the HIPA violations. Instead, the Stuarts requested,[21] and the circuit court submitted, special

---

[19] Majority op., ¶ 4.

[20] Majority op., ¶ 24.

[21] The Special Verdict questions submitted by the Stuarts are contained in Exhibit 107B.

147

verdict questions where causation for damages due to negligence[22] and causation for damages due to misrepresentation[23] were found separately by the jury. The majority opinion conflates the jury's causation findings in order to bring both claims under the HIPA umbrella, but that is contrary to the specific findings of the jury.

¶ 84. Second, whether the jury's award for the Stuarts' claim of common law negligence in construction could under any conceivable legal theory be combined with the jury's award for misrepresentation and then doubled depends on the interpretation of Wis. Stat. § 100.20(5). This is so because the Stuarts' sole right to double damages and an award of attorney fees arises under § 100.20(5). However, the majority opinion engages in no attempt to determine the meaning of § 100.20(5).

¶ 85. We interpret a statute to determine its meaning, assuming that the meaning the legislature intended is expressed in the words the legislature chose. *Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶¶ 43–44, 271 Wis. 2d 633, 681 N.W.2d 110. Statutory language is given its common, ordinary, and accepted meaning when the terms used are not technical or require a special meaning. *Id.*, ¶ 45. If the words are plain and unambiguous, we apply this meaning. *Id.*, ¶ 46. Wisconsin Stat. § 100.20(5) provides:

> Any person suffering pecuniary loss because of a violation by any other person of any order issued under

---

[22] See Special Verdict Question Nos. 8 (relating to negligence in the Remodeling Architectural Contract) and 12 (relating to negligence in the Remodeling Contract).

[23] See Special Verdict Question Nos. 3 (relating to misrepresentation in the Remodeling Architectural Contract) and 15 (relating to misrepresentation in the Remodeling Contract).

this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss.

Section 100.20(5) unambiguously requires that in order to obtain double damages and attorney fees, a claimant must show that he or she suffered "pecuniary loss" "because of" a violation of an "order issued" under § 100.20.

¶ 86.  Wisconsin Admin. Code § ATCP 110.02 has been interpreted as creating an "order" that was "issued" under Wis. Stat. § 100.20. *Rayner v. Reeves Custom Builders, Inc.*, 2004 WI App 231, ¶ 13, 277 Wis. 2d 535, 691 N.W.2d 705 (concluding that ch. ATCP 110 was promulgated pursuant to § 100.20(2), and allows general orders forbidding unfair trade practices). Accordingly, § ATCP 110.02(11), which is the basis of the Stuarts' HIPA claim, is an "order" within the scope of § 100.20(5). Therefore, the Stuarts may obtain twice the amount of the pecuniary loss[24] that they suffered, if the loss was "because of" a representation that the jury found the defendants made in violation of § ATCP 110.02(11). *Snyder*, 260 Wis. 2d 770, ¶ 19 (concluding that because a party must establish that his "pecuniary loss" was suffered "because of" an ATCP violation in order to be entitled to double damages and reasonable attorney fees, an ATCP violation that causes no damages precludes an award of attorney fees).

¶ 87.  Resolution of whether the Stuarts incurred pecuniary loss "because of" a representation made in violation of Wis. Admin. Code § ATCP 110.02(11) requires an interpretation of § ATCP 110.02(11). We interpret an administrative rule such as § ATCP

---

[24] Before us, the defendants do not contest the jury's finding that the Stuarts suffer a pecuniary loss.

110.02(11) "to give effect to the intent of the regulation." *Snyder,* 260 Wis. 2d 770, ¶ 10 (quoting *Jackson v. DeWitt,* 224 Wis. 2d 877, 887, 592 N.W.2d 262 (Ct. App. 1999)). As with statutory interpretation, we begin with the plain meaning of the regulation. *Id.* If the language of the regulation clearly and unambiguously sets forth its meaning, we apply that meaning to the facts presented by the case at hand. *Id.* Section ATCP 110.02 provides in relevant part:

> No seller shall engage in the following unfair methods of competition or unfair trade practices:
>
> . . .
>
> (11) MISREPRESENTATIONS; GENERAL. Make any false, deceptive or misleading representation in order to induce any person to enter into a home improvement contract.

This rule unambiguously requires the Stuarts to prove that the defendants made a "false, deceptive or misleading representation" to induce them to enter into a "home improvement contract."

¶ 88.   There is nothing in Wis. Admin. Code § ATCP 110.02(11) that refers to negligence in the design or in the construction of a home improvement. However, the Stuarts' expert witness, Architect Keith Schultz, opined that the remodeling contractor had not followed the construction specifications that were required by the drawings.

¶ 89.   These failures to follow the drawings support the award of damages for negligent construction. They are independent of any representations that the jury found that the defendants made about complying with the building codes. Accordingly, they do not come within the parameters of Wis. Admin. Code § ATCP

110.02(11), which is the "order" component of Wis. Stat. § 100.20(5). The Stuarts are entitled to double damages only if those damages occurred "because of" a violation of an "order." Events other than misrepresentations, i.e., negligent construction, that caused damages to the Stuarts are not compensable under § 100.20(5). *Paulik v. Coombs,* 120 Wis. 2d 431, 439 n.5, 355 N.W.2d 357 (Ct. App. 1984) (concluding that no attorney fees could be awarded under § 100.20(5) for defending against Coombs' successful counterclaims). Stated otherwise, the negligent construction did not result in damages "because of" an "order" issued under § 100.20. The damages arising from negligent construction stand on different analytical footing. Accordingly, I conclude that the majority opinion errs in lumping all the damages together and doubling them. There is no statutory or administrative rule support for such a conclusion.

¶ 90. The majority opinion relies on *Benkoski v. Flood,* 2001 WI App 84, 242 Wis. 2d 652, 626 N.W.2d 851, for its decision to lump all the damages together, regardless of the cause of the damages, and then double the awards. However, *Benkoski* provides no support for the majority's conclusion. An entirely different question was decided in *Benkoski* than is presented here. *Benkoski* focused on the mathematical calculation of *the amount* of the pecuniary loss, not on whether the pecuniary loss occurred *because of* an order violation.

¶ 91. In *Benkoski,* the question presented was whether the price of a lost sale of a mobile home should be doubled before subtracting the fair market value of the mobile home, or after subtracting the fair market price of the mobile home, in order to arrive at the amount of the "pecuniary loss" under Wis. Stat. § 100.20(5). *Benkoski,* 242 Wis. 2d 652, ¶ 26. The court of appeals relied on our rationale under the Lemon Law

151

cases, where we concluded that the legislature intended to include the purchase price in the calculation of the amount of pecuniary damages. *Id.,* ¶¶ 27–28 (citing *Hughes v. Chrysler Motors Corp.,* 197 Wis. 2d 973, 982, 542 N.W.2d 148 (1996)).

¶ 92.   *Benkoski* does not stand for the proposition that any damages shown by a Wis. Stat. § 100.20(5) claimant, regardless of the cause of the damages, can be lumped together with those incurred because of a § 100.20(5) violation and then doubled. To conclude as the majority opinion has, turns every instance of shoddy workmanship into a HIPA misrepresentation claim.

¶ 93.   Accordingly, were I to assume that a HIPA violation were possible given the jury's findings in regard to what was represented, I would conclude that the Stuarts are entitled under Wis. Stat. § 100.20(5) to double only $23,750,[25] not the entire $95,000 award, because it is only the misrepresentation damages that were sustained "because of" a violation of an "order issued" under § 100.20(5). *Snyder,* 260 Wis. 2d 770, ¶ 19; *Paulik,* 120 Wis. 2d at 439 n.5.

2. Apportionment of damages

¶ 94.   Special Verdict Question No. 16 addressed damages. Part 16A asked the jury to determine the Stuarts' total damages and part 16B asked the jury to apportion the damages between "Misrepresentation" and "Negligence in construction." The jury answered that $95,000 was the Stuarts' total damages and of that amount, 25% was due to "Misrepresentation" and 75% was due to "Negligence in construction." The majority

[25] The jury found total damages of $95,000 and that 25% ($23,750) of those damages was caused by misrepresentation.

opinion concludes that the damages should not have been apportioned between the two different types of claims that the Stuarts tried and prevailed upon.[26]

¶ 95.    The circuit court has broad discretion in fashioning a special verdict form and jury instructions that accompany it. *Meurer,* 90 Wis. 2d at 445; *Maci v. State Farm Fire & Cas. Co.,* 105 Wis. 2d 710, 719, 314 N.W.2d 914 (Ct. App. 1981). A discretionary act is the product of a rational process wherein the facts developed at trial are considered with the law that applies to them.

¶ 96.    The Stuarts tried two types of claims:    misrepresentation to induce contracts (the HIPA claims) and negligence in the design and construction of the addition. All damages recoverable under Wis. Stat. § 100.20(5) must have resulted "because of" a violation of an "order" referenced in § 100.20(5). *Snyder,* 260 Wis. 2d 770, ¶ 19; *Paulik,* 120 Wis. 2d at 439 n.5. The "order" underlying the Stuarts' claim is Wis. Admin. Code § ATCP 110.02(11). The Stuarts requested separate causation questions for misrepresentation and for negligence, and the jury apportioned damages caused by each claim according to its view of the evidence. The jury's findings that 25% of the Stuarts' damages was caused by misrepresentation and 75% was caused by negligent construction are consistent with the evidence adduced at trial. The circuit court considered this evidence and the requirements of § 100.20(5) when it arrived at the apportionment of damages question in the Special Verdict. Accordingly, were I to assume that a HIPA violation were possible given the jury's findings in regard to what was represented, I would conclude

---

[26] Majority op., ¶ 28.

that there was no erroneous exercise of discretion by the circuit court in fashioning the Special Verdict.

¶ 97.   Furthermore, the issue of apportionment of damages is closely related to the issue of double damages. In this regard, the majority opinion continues to rely on *Benkoski;* on the policy it wants to further; and on its determination that the defendants had the burden of "showing" that the damages for different claims could be separated.[27] However, the special verdict shows that the defendants did prove that negligent construction caused damages different from damages caused by misrepresentation. The majority opinion observes, "There is no place in this remedial framework for the apportionment of damages when, as here, the Stuarts' damages flowed from the petitioners' misrepresentations."[28] The majority is incorrect; that is not what the jury found. The Stuarts requested separate questions on negligence and on misrepresentation and separate questions on causation relating to each type of claim.[29] They received what they requested.

¶ 98.   The majority opinion also asserts that "[t]here was not enough evidence presented at trial for the jury to make a determination on apportionment, as demonstrated by the record."[30] The majority opinion never points out why the record is insufficient to support the verdict. Its assertion ignores the uncontroverted testimony of the Stuarts' own expert, Architect Keith Schultz, who testified to the remodeling contractor's failure to follow the drawings and to his

---

[27] Majority op., ¶¶ 28–30.

[28] Majority op., ¶ 29.

[29] See notes 35 and 36 above and Exhibit 107B, the Stuarts' requested Special Verdict.

[30] Majority op., ¶ 31.

observations of shoddy workmanship, as well as building code violations. The jury heard this testimony and it was able to apportion the damages, as the Special Verdict shows. We sustain a jury verdict if there is any credible evidence to support it. *Giese v. Montgomery Ward, Inc.,* 111 Wis. 2d 392, 408, 331 N.W.2d 585 (1983); *Stewart v. Wolf,* 85 Wis. 2d 461, 471, 271 N.W.2d 79 (1978) (concluding that an apportionment of negligence must be sustained if there is any credible evidence to support it). Here, Schultz reviewed the drawings for the addition and compared them with the actual construction. He then pointed out numerous instances where the remodeling contractor did not follow the drawings.[31] This evidence was credible and it supports the jury's verdict.

## D. Economic Loss Doctrine

### 1. General principles

¶ 99. The economic loss doctrine is a common law doctrine created by the courts to recognize that contract law and the law of warranty are better suited than tort law to deal with purely economic loss between two contracting parties. *Kaloti,* 283 Wis. 2d 555, ¶ 28. We have defined "economic loss" as "damages resulting from inadequate value because the product is inferior and does not work for the general purposes for which it

---

[31] Schultz testified that the drawings required double 2x10 floor joists in the hot tub room and only single 2x12 floor joists had been used; the flooring under the carpeting in the hot tub room was to be 3/4 inch tongue and groove OSB over a 1/2 inch sub-floor, but only a 3/4 inch OSB that was not tongue and groove was used and the 1/2 inch sub-floor was entirely omitted; the attic had been vented as required by the code, but insulation had been applied so as to block the attic vents.

was manufactured and sold." *Id.*, ¶ 29 (quoting *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 400–01, 573 N.W.2d 842 (1998)). Economic damages include damages to the product itself and to other components in an integrated system. *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 249–50, 593 N.W.2d 445 (1999). We have applied it to the construction of residential real estate, *Linden v. Cascade Stone Co., Inc.*, 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189, and to remodeling contracts, *1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, 293 Wis. 2d 410, 716 N.W.2d 822. However, contracts for services, where a product is merely incidental, do not fall within the scope of the economic loss doctrine. *Ins. Co. of N. Am. v. Cease Elec., Inc.*, 2004 WI 139, ¶ 36, 276 Wis. 2d 361, 688 N.W.2d 462. When a contract is mixed, including both services and the creation of a product, we must determine the predominant purpose of the contract before we may conclude whether the economic loss doctrine applies. *Linden*, 283 Wis. 2d 606, ¶ 22.

2. Negligence claims

¶ 100. In order to determine whether the economic loss doctrine applies to preclude common law claims for negligence between contracting parties where both a product and services are provided, one must determine whether the predominant purpose of the contract is to provide a product or to provide services. *1325 N. Van Buren*, 293 Wis. 2d 410, ¶ 24; Linden, 283 Wis. 2d 606, ¶¶ 18–22. We employ a totality of the circumstances test to determine the predominant purpose of a contract. *Linden*, 283 Wis. 2d 606, ¶ 22. The totality of circumstances includes both subjective and objective factors. *Id.* Those factors include, but are not limited to, the primary objective the con-

tracting parties entered into the contract to achieve, the requirements of the contract, the nature of the business of the party doing work under the contract, and the value of the materials used. *1325 N. Van Buren, LLC,* 293 Wis. 2d 410, ¶ 42.

¶ 101.  Here, the Stuarts entered into two separate contracts; they tried two negligence claims; and the jury made separate factual findings in regard to negligence under each contract. That is, the jury answered separate questions with regard to:  (1) negligence in performing the Remodeling Architectural Contract[32] and (2) negligence in performing the Remodeling Contract.[33]

### a. The Remodeling Architectural Contract

¶ 102.  In order to evaluate whether the economic loss doctrine has any effect on the Stuart's negligence claim based on the Remodeling Architectural Contract under which the jury found that Weisflog's Showroom Gallery, Inc. negligently designed the addition, I begin by determining whether the predominant purpose of the Remodeling Architectural Contract was for a product or for services, under the totality of the circumstances presented by this case. *Linden,* 283 Wis. 2d 606, ¶ 22.

¶ 103.  Robert Stuart explained that his primary objective in contracting with Weisflog's Showroom Gallery, Inc. under the Remodeling Architectural Contract

---

[32] Special Verdict Question No. 7 asked whether Weisflog Showroom Gallery, Inc. was negligent in its design of the Stuarts' addition.

[33] Special Verdict Question No. 11 asked whether the remodeling contractor was "negligent with respect to the construction of the Stuarts' addition."

was to obtain drawings sufficient for the construction of the addition he and his wife hoped to build. He said that contracting for the drawings was not tied to using Weisflog's Showroom Gallery, Inc. as the builder for the addition. He explained that he could use any builder of his choosing to do the actual construction. The Remodeling Architectural Contract's terms[34] are consistent with his testimony.

¶ 104. There was no testimony that Weisflog's Showroom Gallery, Inc. was in the business of creating drawings for remodeling projects in general. Rather, it appears that the drawings it created were for those who Ronald hoped would hire Weisflog's Showroom Gallery, Inc. to do the remodeling work. There is also nothing in the record that explains how many hours were spent on the drawings or what materials were used in their preparation, aside from the obvious paper on which they were printed. However, there was a product produced, the drawings for the addition the Stuarts built.[35] Its price was a fixed $1,500 and was not dependent on the number of hours it took to create a design that satisfied the Stuarts.

¶ 105. The Remodeling Architectural Contract is much different from the general contract for the construction of a residence that was reviewed in *Linden*. The tort claims at issue in *Linden* were made against subcontractors who produced components in an integrated system. Therefore, we examined the effect that the Lindens' contract with the general contractor had on the subcontractors. *Linden*, 283 Wis. 2d 606, ¶ 25. We concluded that the work of the subcontractors, who provided a stucco coating and roofing for the house had

---

[34] See Exhibit 1.

[35] See Exhibit 3.

no independent value to the Lindens because they contracted to purchase a completed house, not its components. *Id.*, ¶ 29. Therefore, we examined whether the general contract to construct the house had as its predominant purpose the provision of a product or the provision of a service. *Id.*, ¶ 22.

¶ 106. Here, the drawings made under the Remodeling Architectural Contract are not a component of an integrated system as the house's roof was in *Linden*. Rather, the drawings had a separate price and an opportunity for independent use by the Stuarts. As Robert Stuart explained, when the drawings were complete, he was free to choose any builder to do the construction. Accordingly, I conclude that the predominant purpose of the Remodeling Architectural Contract was to produce a product, the drawings for the addition.

¶ 107. However, the jury awarded no damages for negligent design; it awarded damages only for "Negligence in construction." The jury's verdict is reasonable because there was no testimony whatsoever that assigned any value to negligence in design. All of the damages testimony related to the cost of demolishing a portion of the addition, rebuilding it and correcting other construction errors in areas of the addition that were not demolished.

b. The Remodeling Contract

¶ 108. The Remodeling Contract indisputably involved: (1) the creation of a product, the addition, and (2) services, the construction labor. Therefore, I review the totality of the circumstances to determine the predominant purpose of this contract. First, the addition constructed included many facets: a new hot tub room; a new, expanded kitchen; a new, expanded master bedroom suite; a powder room and entry change; and

an add-on to the garage with a mudroom, bath and family room; and an outdoor in-ground swimming pool and surrounding deck. Accordingly, a product was created. Second, the Stuarts' primary objective in entering into the Remodeling Contract was to nearly double the size of their home and significantly upgrade its amenities. Third, the "remodeling contractor," Weisflog's Showroom Gallery, Inc., was in the business of creating products: remodeled residential properties. Fourth, the addition's cost to the Stuarts was $278,076.96. This cost included materials and the labor necessary to create a 2,000 square foot addition. The cost of all the materials is not fully identified, but the allowances for such items as pool, hot tub, cabinets, carpet, window coverings, countertops and appliances is $74,113.[36] Finally, the Remodeling Contract stated that the "Contract amount is based upon bid sheet." Any changes in the specifications bid upon that raised or lowered the cost of the addition would be charged or credited to the Stuarts. Therefore, the parties bargained for the price of the addition based on the specifications, not on the hours of labor it took to complete the addition. Under the totality of the circumstances presented, the Stuarts contracted for much more than services with materials being merely incidental, as was the case in *Cease Electric*. The Remodeling Contract had as its predominant purpose the creation of a product, the Stuarts' home addition. It falls squarely within the economic loss doctrine's proscription that the Stuarts may not maintain tort claims for the failure to complete the construction in a workmanlike manner. Their claims sound in contract. *Linden*, 283 Wis. 2d 606, ¶ 22.

---

[36] See Exhibit 4.

¶ 109.    The analysis of the Remodeling Contract for the Stuarts' home should follow the analysis we employed in *1325 North Van Buren*. There, we applied the totality of circumstances test to the remodeling of a warehouse and concluded that the parties bargained to produce a product:    42 residential condominiums and adjacent parking garages. *1325 N. Van Buren,* 293 Wis. 2d 410, ¶ 46. My conclusion here is consistent with *1325 North Van Buren, LLC* and with *Linden,* but the majority opinion's is not.

¶ 110.    The majority opinion's analysis gets off track because it conflates the two contracts and asserts that the Remodeling Architectural Contract, under which the drawings for the addition were created, is "the core transaction, from which the contract for the remodeling and for the addition flowed."[37] The majority opinion never defines a "core transaction." It also simply assumes, without analysis, that the Remodeling Architectural Contract is a contract for services.[38] The majority opinion then labels the Remodeling Architectural Contract as the "core" contract and concludes that since it is a services contract, the Remodeling Contract's primary purpose is also to provide services.[39] These conclusions permit the majority opinion to side-step the economic loss doctrine without an analysis of the totality of the circumstances presented by the claims in this case. A totality of the circumstances analysis is required before the predominant purpose of a contract can be determined when a contract provides both a product and services. *1325 N. Van Buren,* 293 Wis. 2d 410, ¶ 29; *Linden,* 283 Wis. 2d 606, ¶ 22.

---

[37] Majority op., ¶ 33.

[38] *Id.*

[39] *Id.*

¶ 111. The majority opinion also errs because it ignores both the facts and the law that apply to the question presented. First, the undisputed testimony of Robert Stuart is that he owned the drawings and could have taken them to any builder he chose to construct the addition. Query, if the Stuarts took the drawings to another builder and that builder negligently constructed the addition, would the predominant purpose of the contract to construct the addition be for services? Would the defendants be liable for the negligence of the builder who carelessly constructed the addition? The answer to each question is "no."

¶ 112. Second, the questions this case presents require the court to undertake a totality of the circumstances analysis to determine the predominant purpose of the Remodeling Contract. In my view, the majority opinion would come to a different result if it followed the court's precedent so clearly set out in *1325 North Van Buren* and in *Linden*. Accordingly, in conformance with that precedent and the predominant purpose of the Remodeling Contract, I conclude that the Stuarts' claim for negligent construction is barred by the economic loss doctrine and the $71,250[40] in damages awarded by the jury for that claim must be vacated.

E. Personal Liability

¶ 113. The jury was asked to determine whether the Remodeling Contract was with Ronald Weisflog or with Weisflog's Showroom Gallery, Inc., in order to determine whether Ronald Weisflog had personal liability for construction defects. It determined that

[40] The jury found total damages of $95,000 and that 75% ($71,250) of those damages were caused by negligent construction of the addition.

Weisflog's Showroom Gallery, Inc. was the party with whom the Stuarts contracted to do the construction of the addition.[41] The majority opinion concludes that the circuit court erred in not submitting a question in regard to Ronald Weisflog's personal liability for the Stuarts' HIPA claims.[42] However, the Stuarts asked for no question that would have assigned personal liability to Ronald Weisflog for misrepresentation. What the Stuarts requested was:

> Taking 100 percent as a total amount of negligence which caused damages to the Plaintiffs, Robert and Lin Stuart, what percentage of such total negligence do you attribute to:
>
> (i) Weisflog Showroom Gallery, Inc. ____%
>
> (ii) Ronald Weisflog ____%
>
> 100%[43]

¶ 114.  The majority opinion also orders a new trial. On remand, the circuit court must consider whether the HIPA misrepresentation claim on which the jury decided in favor of the Stuarts is based on a legally actionable representation or on a promise of future performance because this question has never been addressed. A representation of a fact then in existence or of a pre-existing fact is required for actionable misrepresentation. *Consol. Papers,* 153 Wis. 2d at 594. In my view, when the law on this issue is properly analyzed, the jury verdict supports no HIPA claim. Accordingly, there can be no new trial in regard to a claim of misrepresentation based on promises of future performance.

---

[41] See Special Verdict Question No. 9.

[42] Majority op., ¶ 43.

[43] See Exhibit 107B, question 20.

## III. CONCLUSION

¶ 115. In conclusion, I dissent in part because I conclude, contrary to the majority opinion, that the following five holdings should be this court's conclusions when the law is applied to those facts found by the jury: (1) the defendants' representations that they would design drawings and construct an addition to the Stuarts' home consistent with the building codes are not representations of a then existing or pre-existing fact and accordingly they cannot form the basis for a HIPA violation based on misrepresentation; (2) assuming that a HIPA violation were possible given the jury's findings in regard to what was represented, nothing in Wis. Admin. Code, ch. ATCP 110, nor in Wis. Stat. § 100.20(5) on which this HIPA claim is based, authorizes doubling the jury's award of damages for negligent construction, as well as those damages awarded for the HIPA violation; (3) assuming that a HIPA violation were possible given the jury's findings in regard to what was represented, the circuit court did not err by permitting the jury to allocate damages between the HIPA claim and the negligence claim because the Stuarts pled both types of claims, tried both types of claims and requested Special Verdict questions on both types of claims; (4) the economic loss doctrine bars the negligence claims that are based on negligent design and construction of the addition; and (5) the circuit court did not err in drafting Special Verdict Question 9, which placed Ronald Weisflog on the Special Verdict solely in regard to whether he was a principal in the Remodeling Contract because that is the only context in which he could have been personally liable under the evidence adduced at trial.

¶ 116.  Accordingly, I would reverse the decision of the court of appeals and remand the case to the circuit court to vacate the award of damages and attorney fees.

¶ 117.  I am authorized to state that Justices DAVID T. PROSSER and ANNETTE KINGSLAND ZIEGLER join this opinion.