In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-2719

MARK LUCTERHAND,

*Plaintiff,*

*v.*

GRANITE MICROSYSTEMS, INCORPORATED
and DANIEL ARMBRUST,

*Defendants-Appellants,*

*v.*

FEDERAL INSURANCE COMPANY and
VIGILANT INSURANCE COMPANY,

*Intervenors-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05 C 1047—**J.P. Stadtmueller**, *Judge.*

ARGUED FEBRUARY 14, 2008—DECIDED APRIL 28, 2009

Before RIPPLE, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* Granite Microsystems, Inc. and its president were sued by a former employee for intentional infliction of emotional distress, false imprisonment,

and wrongful employment termination. They were insured under two liability policies providing defense-and-indemnity coverage for bodily injury caused by an "occurrence," which was defined in the policies as an "accident." A third liability policy provided coverage for bodily injury caused "by accident." At issue in this appeal is whether the former employee's allegations trigger coverage under these policies. The district court said "no," and we agree. The insurance policies cover liability for accidental, not intentional, injuries; the employee's lawsuit alleged only intentional, not accidental, injuries. We therefore affirm the judgment of the district court.

## I. Background

Granite Microsystems, a Wisconsin corporation, makes custom-integrated computers and computer-related products. Daniel Armbrust is president of Granite Microsystems, and Mark Lucterhand was its Director of Global Operations. In the fall of 2004, Lucterhand ruptured his quadriceps while walking down a flight of stairs at work. Armbrust witnessed the injury, but despite Lucterhand's obvious agony and inability to walk on his own power, Armbrust "forcibly transported" him "against his will" to a scheduled business meeting where for two hours he endured excruciating pain. Several hours after his injury, Lucterhand was finally transported to the hospital where he underwent surgery and received postsurgical care for five days. Armbrust called him at the hospital "at least twice" to "hasten his discharge." When Lucterhand returned to work, Armbrust accused him of "milking" his injuries and soon fired him.

Lucterhand sued Granite Microsystems and Armbrust[1] in federal court for intentionally terminating his employment in retaliation for exercising his rights under the Family and Medical Leave Act ("FMLA"). *See* 29 U.S.C. § 2615. Lucterhand also asserted state-law claims for intentional infliction of emotional distress and false imprisonment.

Granite Microsystems tendered the lawsuit to its insurers, Federal Insurance Company and Vigilant Insurance Company, for defense and indemnity. Federal insured the company under a Commercial General Liability ("CGL") policy and a Workers Compensation and Employers Liability ("Workers Compensation") policy during the relevant time period. Vigilant insured the company under a Commercial Excess and Umbrella Insurance ("Excess & Umbrella") policy. Two of the policies—the CGL policy and the Excess & Umbrella policy—provided defense-and-indemnity coverage against liability for damages for bodily injury and property damage caused by an "occurrence," defined in the policies as an "accident." The Workers Compensation policy covered liability for benefits required by workers compensation law for "bodily injury by accident."

The insurance companies declined the tender and intervened in the lawsuit, seeking a declaratory judgment that the policies did not cover the damages alleged

---

[1] For brevity, we refer to Granite Microsystems and Armbrust collectively as "Granite Microsystems" unless the context requires otherwise.

by Lucterhand. On cross-motions for summary judgment, the district court agreed with the insurers, concluding that there was no coverage because Lucterhand's lawsuit against Granite Microsystems did not even arguably allege damages from an "accident."

## II. Analysis

Wisconsin law governs this suit, which was filed under the court's diversity jurisdiction. In Wisconsin, as elsewhere, a liability insurer must defend a suit against its insured if the allegations in the underlying complaint raise the possibility of coverage under the terms of the insurance policy. *See Estate of Sustache v. Am. Family Mut. Ins. Co.*, 2008 WI 87, ¶ 20, 311 Wis.2d 548, ¶ 20, 751 N.W.2d 845, ¶ 20 ("The insurer's duty to defend is . . . broader than its duty to indemnify insofar as the former implicates arguable, as opposed to actual, coverage."); *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶¶ 19-20, 261 Wis.2d 4, ¶¶ 19-20, 660 N.W.2d 666, ¶¶ 19-20. The issue, then, is whether the allegations in Lucterhand's complaint fall potentially within the coverages of the CGL, Excess & Umbrella, and Workers Compensation policies. *Sustache,* 2008 WI 87, ¶ 20 ("An insurer's duty to defend its insured is determined by comparing the allegations of the complaint to the terms of the insurance policy.").[2] Our standard of review is de novo. *First Nat'l*

---

[2]  In *Sustache* the Wisconsin Supreme Court discussed the "four corners rule" and explained a particular procedural context in
(continued...)

*Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 976 (7th Cir. 2007).

The complaint alleged that Granite Microsystems intentionally terminated Lucterhand's employment in retaliation for exercising his FMLA rights, intentionally inflicted emotional distress, and falsely imprisoned him. The last two claims are intentional torts; the first is a statutory claim under the FMLA, and the complaint alleged that Armbrust intentionally fired Lucterhand in violation of his rights under the statute. It is well estab-

---

[2] (...continued)

which the rule does not apply. The court noted that ordinarily "[t]he duty to defend is triggered by the allegations contained within the four corners of the complaint." *Sustache*, 2008 WI 87, ¶ 20. This is the four-corners principle, and it remains the general rule in duty-to-defend cases in Wisconsin. When an insurer contests coverage but invokes its option to provide a defense to the insured under a reservation of rights, *see id.* ¶ 25 (citing *Baumann v. Elliott*, 2005 WI App 186, ¶ 8, 286 Wis.2d 677, ¶ 8, 704 N.W.2d 361, ¶ 8), it remains entitled to a determination of its defense obligation separate from a determination on the merits, *id.* ¶ 26 (citing 2 ARNOLD P. ANDERSON, WISCONSIN INSURANCE LAW §§ 7.51-.52 (5th ed. 2004)). This option is typically exercised when the underlying complaint states an arguably covered claim. In that situation, where the insurer has satisfied its initial duty to defend by providing counsel to its insured and seeks a judicial determination of its continued defense obligation, Wisconsin permits introduction of extrinsic evidence where appropriate to the resolution of the coverage question. *Id.* ¶¶ 27-29. This case falls within the general four-corners rule.

lished that liability policies generally do not cover losses that are intentionally caused. "Insurance transactions are predicated on the general proposition that coverage is provided for fortuitous losses, and not for intended consequences." ROBERT E. KEETON & ALAN I. WIDISS, INSURANCE LAW: A GUIDE TO FUNDAMENTAL PRINCIPLES, LEGAL DOCTRINES, AND COMMERCIAL PRACTICES, § 5.4(a), at 497 (practitioner's ed. 1988). The transferred risk is the defense against and payment of damages for which the insured becomes responsible because of an *accident*.

To reflect this fortuity principle, insuring agreements in liability policies typically specify that the insurer will pay damages for which the insured becomes legally responsible "because of an accident," *id.* at 498, or, as in the CGL and Excess & Umbrella policies at issue in this case, damages for bodily injury or property damage "caused by an occurrence," with "occurrence" defined as "an accident." *Id.* § 5.4(g), at 544; *see also* 16 HOLMES, ERIC MILLS, HOLMES' APPLEMAN ON INSURANCE 2D § 117.4(A)(1), at 297 (2000) ("[T]he *occurrence* concept preserves the fortuity principle and requirements recognized under the earlier *accident* test."). Similarly, the Workers Compensation policy at issue here covers "bodily injury by accident." Although the term "accident" is not defined in any of the policies, Wisconsin uses several alternative but similar definitions to demarcate its meaning. An "accident" as that term is used in liability insurance is "[a]n unexpected, undesirable event or an unforeseen incident which is characterized by a lack of intention." *Everson v. Lorenz*, 2005 WI 51, ¶ 15, 280 Wis.2d 1, ¶ 15, 695 N.W.2d 298, ¶ 15 (citations and internal quotation marks omitted). And:

"'The word "accident," in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental.'" *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 37, 268 Wis.2d 16, ¶ 37, 673 N.W.2d 65, ¶ 37 (quoting BLACK'S LAW DICTIONARY 15 (7th ed. 1999)).

In addition, liability policies will often contain a specific exclusion for intentional or expected injuries. KEETON & WIDISS, *supra*, § 5.4(a), at 499. An intentional-acts exclusion embodies the same "fortuity" principle as the policy language granting coverage only for injuries caused by "an accident" (or an "occurrence" defined as "an accident"). The CGL and Excess & Umbrella policies contained intentional-acts exclusions specifically excluding coverage for "bodily injury . . . arising out of an act that: is intended by the insured; or would be expected from the standpoint of a reasonable person in the circumstances of the insured, to cause bodily injury." Similarly, the Workers Compensation policy specifically excluded coverage for "bodily injury intentionally caused or aggravated by you."

In addressing the coverage question in this case, the district court first focused on the term "accident," which appears in the coverage-granting language in all three policies. *See Am. Girl,* 2004 WI 2, ¶ 24 (describing the sequential analytical steps in an insurance-coverage dispute). The court concluded that coverage under each policy depended not on whether *the damage* Armbrust was alleged to have caused was accidental but whether

"Armbrust's actions themselves" were accidental. Because the complaint alleged that Armbrust's actions were intentional, the court concluded that coverage was not even arguable under any of the policies.

Granite Microsystems claims this analysis is backward. The company argues that the focus instead should be on whether the *damage* alleged in the complaint was intended or accidental, not whether Armbrust's *actions* alone were intentional. Granite Microsystems maintains that even if Armbrust is alleged to have engaged in intentional *acts*, if the alleged *injury* was not intentional, then the complaint seeks damages for an "accident" and the claims are covered.

This intentional-acts/intentional-injury distinction makes no difference in this case, for reasons we will explain in a moment. We note, however, that in cases in which the distinction *might* make a difference, the law is not well settled. Courts nationwide have struggled to sketch the contours of the term "accident" (or "occurrence" defined as an "accident"), and because the cases present in such a wide variety of factual settings, it is difficult to discern a general doctrinal consensus. *See generally* COUCH ON INSURANCE §§ 129:3 & n.11, 139.20 & 139.23 (Lee R. Russ & Thomas F. Segalla eds., 3d ed. 2005) (discussing distinction between accidental means and accidental results/injury); 16 HOLMES, ERIC MILLS, *supra,* § 117.4; KEETON & WIDISS, *supra,* § 5.4(d)(2). As one treatise has noted, "the requirement that for a particular type of insurance to provide coverage a loss must be 'fortuitous' or 'accidental' has produced a substantial body of appellate decisions.

The judicial opinions in these cases are a medley . . . ." KEETON & WIDISS, *supra*, § 5.4(a), at 499.

   While some courts have adopted the position advanced by Granite Microsystems—that an intentional act qualifies as an "accident" if the particular damage that resulted was unintended—others have adopted the approach taken by the district court, holding that intent to cause injury is irrelevant when the causal acts in question were intentional. *Compare Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 839 (Mich. 1999) (intentional causal act *and* intent to injure are required for a claim to be "nonaccidental," but a claim does not allege an "accident" merely because the alleged harm exceeded the harm that was intended), *with Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1148 (9th Cir. 1998) ("accident" refers to "the happening of the event itself and not the consequences of that act"; event is not an accident if insured "intended all the acts that resulted in the victim's injury" even though he "did not intend to cause the injury") (California law).[3]

---

[3]  *See also Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*, 442 F.3d 1239, 1246 (10th Cir. 2006) (distinguishing "intent to act" and "intent to injure") (Kansas law); *Lyons v. State Farm Fire & Cas. Co.*, 811 N.E.2d 718, 723 (Ill. App. Ct. 2004) ("The focus of the inquiry in determining whether an occurrence is an accident is whether the *injury* is expected or intended by the insured, not whether the *acts* were performed intentionally."); *Transamerica Ins. Servs. v. Kopko*, 570 N.E.2d 1283, 1285 (Ind. 1991) (complaint alleges accident if "there is an element of negligence to be determined").

This ongoing debate is reflected in the Wisconsin Supreme Court's two most recent opinions construing the term "occurrence" in liability policies. In *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, 311 Wis.2d 492, 753 N.W.2d 448 ("*Stuart II*"),[4] the court considered whether a CGL policy defining "occurrence" as an "accident" provided coverage for a claim based on a violation of a State deceptive-practices regulation. The regulation prohibited the making of any "false, deceptive or misleading representation in order to induce any person to enter into a home improvement contract." *Id.* ¶ 7 n.7 (quoting WIS. ADMIN. CODE ATCP § 110.02(11) (2008)). The insured building contractor had performed substantial remodeling work on a home, and the homeowner later discovered numerous significant defects in the work. The homeowner sued the contractor for (among other things) violating the deceptive-practices regulation, and the contractor sought coverage for the claim.

In determining whether the claim involved damages caused by an "occurrence"—that is, an "accident"—a five-justice majority of the court said it would focus on "whether the occurrence giving rise to the claim[] was an unintentional act in the sense that it was not volitional." *Id.* ¶ 37. This is somewhat cryptic; the court did not

---

[4] We refer to this decision as *"Stuart II"* because the court resolved other issues in the case in an earlier opinion, *see Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, 308 Wis.2d 103, 746 N.W.2d 762, which the court referred to as *"Stuart I."* *Stuart II*, 2008 WI 86, ¶ 3.

explain whether there is any difference between an "unintentional" act and one that is "not volitional," and if the terms essentially mean the same thing, we are simply back where we started. The court did, however, appear to focus its attention on whether the *act* that led to the damage—the "causal event," as opposed to the injury itself—was unintentional. The contractor contended that because it had not intended the specific property damage that resulted from the construction defects, it was entitled to coverage under the policy. The court rejected this argument, concluding that "[i]t does not matter whether [the insured] intended a specific result; what matters is whether the cause of the damage was accidental." *Id.* ¶ 40. Although the deceptive-practices regulation was silent on the actor's intent to deceive, it did contain a purposive element; it prohibited false representations made "in order to induce" the making of a home-improvement contract. This "inducement" requirement made a difference to the court's majority. Because the false representations made by the contractor were "volitional" and made "for the purpose of inducing" the home-improvement contract, the court held there was no "accident" and therefore no "occurrence" within the meaning of the policy. *Id.*

Two members of the five-justice majority wrote separately to explain their view that the sole relevant question was "whether the injury or damages are unexpected and unintentional." *Id.* ¶ 71 (Bradley, J., joined by Abrahamson, C.J., concurring). Justice Bradley and Chief Justice Abrahamson thus joined the majority opinion only insofar as it could be read to equate the

regulatory violation with a claim for intentional misrepresentation, and because damages caused by intentional misrepresentation are not accidental, they agreed the claim was not covered. *Id.* ¶¶ 70-80.

Two other justices concurred in the result only, writing separately to express still a different view. *Id.* ¶¶ 83-99. Although they agreed with the majority opinion that the relevant question was whether the *acts* leading to the injury were intentional or accidental, they significantly narrowed the scope of the inquiry. *Id.* ¶¶ 98-99 (Roggensack, J., and Ziegler, J., concurring). The disagreement centered on the proper interpretation of the court's volitional-act requirement. While the majority thought the false representations in question were sufficiently volitional (and therefore nonaccidental) because they were made "in order to induce" the contract, Justices Roggensack and Ziegler focused simply on whether the mere *act of making* the representations was *itself* volitional. *Id.* ¶ 99. Because the contractor's act of making the representations was volitional, these concurring justices concluded there was no accident. *Id.* In the end, then, while the *Stuart II* court unanimously concluded there was no coverage, it was split 3-2-2 on the rationale.

On the same day that *Stuart II* was released, the court issued a second case construing similar "occurrence" language in a homeowner's policy, and this time the court was far less fractured. *Estate of Sustache v. Am. Family Mut. Ins. Co.*, 2008 WI 87, 311 Wis.2d 548, 751 N.W.2d 845. In *Sustache* the court considered whether a homeowner's policy provided coverage for a battery claim

stemming from a fight in which the homeowner's son punched a partygoer in the face. The victim later died from his injuries. The homeowner's son defended his actions in part based on a claim of self-defense; he also claimed (and there was no dispute) that he did not intend his punch to be fatal. As in *Stuart II,* the insurance policy covered damages caused by an "occurrence," defined as "an accident." The court held that the allegations of intentional battery—that the son intentionally caused bodily injury by punching the victim—"evince a degree of *volition* inconsistent with the term 'accident.'" *Id.* ¶ 54. That is, there were allegations of both an intentional act *and* intent to cause injury. *Id.* ¶ 53. The court concluded that regardless of the son's claim of self-defense and his lack of specific intent to cause the harm that ultimately resulted (the victim's death), the alleged conduct was part of "a pattern of volitional action" and therefore was not "accidental." *Id.* ¶¶ 54, 56. As in *Stuart II*, Justice Bradley concurred, criticizing the majority for its "shifting rationales"; in her view, the only relevant question was whether *injury* was intended. *Id.* ¶¶ 62-66 (Bradley, J., concurring). Because the son allegedly "intended harm to [the victim] when he threw the punch," Justice Bradley said, "there is no accident here." *Id.* ¶ 70.

*Sustache* is closer to our case than *Stuart II*, and although the case did not purport to resolve the court's analytical disagreement (it didn't need to), its no-coverage conclusion is informative here. Accordingly, we don't need to reconcile the justices' competing interpretations of

the term "occurrence" in order to decide this case.[5] Lucterhand's complaint alleged not just intentional acts but also injuries intentionally caused, so under any of the Wisconsin Supreme Court's possible approaches, there is no coverage.

In the first count, Armbrust is accused of intentionally firing Lucterhand and intentionally violating the Family and Medical Leave Act, both of which caused Lucterhand to lose wages and employment benefits. As Granite Microsystems conceded at oral argument, the allegations in this count suggest both an intent to act and an intent to injure. When an employer fires a worker, it goes without

---

[5] Though we need not reach the question of the intentional-acts exclusion, we note for completeness that Wisconsin law interpreting intentional-acts exclusions in liability policies appears to be more settled on the question of whether there is any distinction between *intended acts* and *intended injuries*. "In Wisconsin, an intentional-acts exclusion precludes insurance coverage only where the insured acts intentionally and intends some harm or injury to follow from the act." *Loveridge v. Chartier*, 468 N.W.2d 146, 150 (1991). An insured "intends to injure or harm another if he 'intend[s] the consequences of his act, or believe[s] that they are substantially certain to follow.'" *Id.* (quoting *Pachucki v. Republic Ins. Co.*, 89 Wis.2d 703, 710 (Wis. 1979)). Thus, an intentional-acts exclusion applies "where an intentional act is substantially certain to produce injury," and this is so "even if the harm that occurs is different in character or magnitude from that intended by the insured." *Id.* at 150-51. As we have noted, intentional-acts exclusions in liability policies function in much the same way as the "accident" limitation contained in the coverage-granting language.

saying that it intends for the worker to lose his salary and benefits. *Cf. Jespersen v. U.S. Fid. & Guar. Co.*, 551 A.2d 530, 532 (N.H. 1988) (loss of wages and emotional distress are not accidental because they are the "natural consequence" of intentional discharge). Thus, an employment termination qualifies as both an intentional or "volitional" act and an intentional injury.

The same is true of the second count, in which the defendants are accused of intentionally inflicting emotional distress. Intentional infliction of emotional distress requires the defendant to have intended to cause injury. *Rabideau v. City of Racine*, 2001 WI 57, ¶¶ 33-36, 243 Wis.2d 486, ¶¶ 33-36, 627 N.W.2d 795, ¶¶ 33-36. And while Lucterhand's legal theory isn't dispositive—it is the facts alleged in the complaint that matter, *see Stuart II*, 2008 WI 86, ¶ 36; *Am. Girl*, 2004 WI 2, ¶ 41—it is apparent that he is claiming that Armbrust's conduct, which he characterizes as "intentionally unlawful," was deliberately calculated to cause him emotional injury.

Finally, in the third count, Lucterhand seeks compensation for false imprisonment and intentional withholding of medical treatment, which allegedly caused him "pain and suffering," "emotional distress," and "humiliation[,] embarrassment and degradation." The complaint specifically alleges that Armbrust witnessed Lucterhand's injury and then "forcibly transported" him "against his will" to a business meeting despite observing his "incapacity" and "extraordinary level of pain." It would be hard to understand these allegations as describing an injury that happened accidentally. At a minimum, the complaint alleges

that Armbrust acted intentionally and that he realized his actions were prolonging Lucterhand's pain and distress, which is enough to remove them from the realm of an accident regardless of which understanding of "accident" is adopted.

The parties have briefed a number of other issues, including whether the policies' intentional-acts or "employment-related practices" exclusions preclude coverage. But given our conclusion that none of the allegations even arguably trigger coverage under the policies' initial grant of coverage, there is no need to resolve these other issues.

AFFIRMED.