COURT OF APPEALS
DECISION
DATED AND FILED

June 11, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP340**

Cir. Ct. No.  **2019CV66**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

---

EVAN R. BAKKE, AS SPECIAL ADMINISTRATOR
FOR THE ESTATE OF LISA CAROL BAKKE,

　　PLAINTIFF-RESPONDENT,

　V.

MT. MORRIS MUTUAL INSURANCE COMPANY, STEPHEN TANSKI,
DOUGLAS V. BROWN, SECURITY HEALTH PLAN OF WISCONSIN, INC.
AND WISCONSIN DEPARTMENT OF HEALTH SERVICES,

　　DEFENDANTS,

AUTO OWNERS INSURANCE COMPANY AND NORTHLAND BUILDERS, INC.,

　　DEFENDANTS-APPELLANTS.

---

APPEAL from a judgment and an order of the circuit court for Burnett County:  MELISSIA R. MOGEN, Judge.  *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Northland Builders, Inc., and Auto-Owners Insurance Company (collectively, "Northland") appeal a judgment entered on a jury verdict in a personal injury action brought by Lisa Carol Bakke[1] and a circuit court order denying their postverdict motion. Northland argues that the court erred by not asking the jury to consider Bakke's postaccident conduct when allocating causal negligence on the special verdict form and by refusing the jury's request to see one of the experts' photographs during deliberations. We conclude that the court did not err in either respect. We therefore affirm.

## BACKGROUND

¶2      Bakke was injured in 2016 when she fell through a railing while climbing the stairs of a cabin owned by Stephen Tanski. Tanski built the original stairs and railing on the cabin with a friend in 2000 or 2001 and then had a log railing installed in 2008. In 2010, Tanski hired Doug Brown from Northland to replace and upgrade the railing, which was failing due to rot. Bakke sued Tanski, Northland, and their respective insurers, seeking recovery for her injuries, which included a broken collarbone, a brain injury, cracked ribs, and spinal fractures. The parties stipulated that Bakke's past medical and out-of-pocket expenses were $90,768.20, leaving the issues of liability and pain and suffering damages for the jury's determination.

---

[1] Bakke died from causes unrelated to her injury after filing this lawsuit but prior to trial. Evan Bakke, special administrator for the Estate of Lisa Carol Bakke, was substituted as the correct party in interest.

¶3      At trial, Northland argued that Bakke did not exercise reasonable care in seeking or complying with medical treatment for her injuries. Northland presented evidence that Bakke refused to obtain medical care for several days following her fall and that she failed to participate in the recommended treatment for her injuries, including failing to engage in any cognitive therapy for her brain injury.

¶4      Regarding its liability for the railing's failure, Northland argued that the underlying structure[2] to which Brown had attached the railing broke due to rot. Northland presented expert testimony from Geoff Jillson, who opined that the railing's failure was caused by two things: the wooden structure to which the railing was attached had deteriorated due to rot, causing a piece to snap off, and "the overall design of it from an engineer[ing] perspective." Jillson documented his investigation with twenty-five pages of annotated photographs, which were admitted into evidence without objection, showing the broken board and the screws that pulled away from the wood. However, these photographs were never published to the jury. Instead, Northland used the board itself as an exhibit during the trial.

¶5      Bakke presented expert testimony from Richard Abbott. Abbott opined that Northland's construction of the railing was deficient because the screws that connected the posts to the underlying structure "were very closely spaced together and the posts didn't have a real good bite down onto" the

_____

[2] Northland's opening brief provides a high level of detail regarding the construction of the stairs and the railing, including the respective roles of stringers, treads, risers, and newel posts. Although these details were helpful to us in understanding the testimony and in evaluating how the evidence supported each party's theory of liability, we now refer generally to the portion of the stairs not installed by Northland as "the underlying structure."

underlying structure. Abbott further testified that he would never have connected the railing to the underlying structure in the way that Brown had because "you have to just break off the tiniest piece" in order for the railing to fail. Regarding Northland's theory that a piece of the underlying structure broke due to rot, Abbott testified that he observed weathering on the underlying structure but not rot.

¶6    Both Jillson and Abbott testified that the lateral load capacity for the railing was far below what the applicable building code required. Abbott opined that Bakke's fall was caused by the fact that the railing "wasn't designed and constructed according to code." In contrast, Jillson testified that Northland's failure to comply with the building code was "okay."

¶7    At the beginning of jury deliberations, the jury asked to see the photographs taken by Jillson. The circuit court denied this request. The jury returned a unanimous verdict that allocated 15% of the causal negligence for Bakke's injuries to Tanski, 85% of the fault to Northland, and no fault to Bakke. The jury awarded $80,000 for Bakke's pain, suffering, and disability.

¶8    Northland filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Northland challenged the special verdict for only asking whether each party had been negligent "at or prior to the accident." In particular, Northland argued that the jury should have been permitted to apportion causal negligence to Bakke based on her postaccident conduct of not promptly seeking medical treatment and not complying with the recommended treatment for her injuries. Northland also argued that the circuit court erred by refusing to send the requested photographs to the jury room. To support this aspect of its motion, Northland submitted an affidavit from Brown stating that a juror had come to Northland's office shortly after the trial to complain that Northland had been

4

"unjustly railroaded." The juror stated that he would have really liked to have seen Jillson's photographs.

¶9    The circuit court denied Northland's postverdict motion after a hearing and entered judgment in favor of Bakke. Northland now appeals this judgment and order.

## DISCUSSION

### I. The special verdict question

¶10    Northland first challenges the phrasing of the special verdict question that asked the jury to determine whether Bakke was causally negligent "at or prior to the accident." Northland contends that the jury should also have considered whether Bakke was causally negligent after the accident. Specifically, Northland presented evidence that Bakke had delayed seeking medical attention for several days following her fall and also failed to participate in recommended treatment for her injuries. Northland argued that the jury should be permitted to allocate causal negligence to Bakke based on this postaccident conduct.

¶11    The circuit court disagreed, explaining that Bakke's postaccident conduct went to damages and not to causal negligence. Accordingly, the court gave the jury a failure to mitigate damages instruction, which instructed the jury to consider Bakke's postaccident conduct when determining its damages award. Northland agrees that the jury was properly instructed regarding Bakke's failure to mitigate her damages. Nonetheless, Northland argues that the jury should have considered the same postaccident conduct when allocating causal negligence among Tanski, Northland, and Bakke.

¶12     The parties disagree about the appropriate standard for our review of the content of the special verdict.  Bakke argues that we should review the questions on the special verdict for an erroneous exercise of discretion.  *See* ***Vogel v. Grant-Lafayette Elec. Coop.***, 201 Wis. 2d 416, 422, 548 N.W.2d 829 (1996) ("A circuit court has wide discretion as to the instructions and special verdicts given to a jury, provided that they adequately cover the law applicable to the facts.").  Northland argues that our review should be de novo because the content of a special verdict requires us to interpret and apply the statute governing special verdicts.  *See* WIS. STAT. § 805.12 (2021-22);[3] ***Theuer v. LIRC***, 2001 WI 26, ¶5, 242 Wis. 2d 29, 624 N.W.2d 110 ("The interpretation of a statute and its application to undisputed facts are questions of law that courts generally review under a de novo standard.").  Specifically, Northland points to the statutory requirement that a special verdict "be prepared by the court in the form of written questions relating only to material issues of ultimate fact and admitting a direct answer."  *See* § 805.12(1); *see also* ***Stuart v. Weisflog's Showroom Gallery, Inc.***, 2008 WI 22, ¶12, 308 Wis. 2d 103, 746 N.W.2d 762 ("[A] special verdict must cover all material issues of ultimate fact.").

¶13     Regardless of the standard of review we use, we conclude that the circuit court correctly concluded that Bakke's postaccident conduct presented only a damages issue and not an issue of causal negligence.  Northland's argument that Bakke's postaccident conduct caused her injuries is creative, but it reflects a complete misunderstanding of tort liability and the role of a plaintiff's failure to mitigate damages.

---

[3] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶14　A plaintiff's failure to mitigate damages is not a cause of the plaintiff's injury because the plaintiff's duty to exercise ordinary care to mitigate damages only arises after the plaintiff has been injured by negligent conduct. *See Lobermeier v. General Tel. Co. of Wis.*, 119 Wis. 2d 129, 147, 349 N.W.2d 466 (1984) (quoting with approval a prior version of the Wisconsin jury instruction stating that "it became the duty of the plaintiff when he was injured in the collision to exercise ordinary care to mitigate, or lessen, his damages"); *see also* WIS JI—CIVIL 1730 (2012) ("A person who has been injured must use ordinary care to mitigate or lessen … damages."). Our supreme court has further explained that it is "a matter of black letter law" that "[a]ny suffering or disability incurred by one who has sustained personal injury, when the same could have been avoided by submitting to treatment by a physician selected with reasonable care, must be excluded as a ground of recovery." *Lobermeier*, 119 Wis. 2d at 144-45 (citation omitted). Thus, the circuit court here correctly applied Wisconsin law when it concluded that Bakke's postaccident conduct went only to damages and not causation.

¶15　Because the parties stipulated to the amount that would fairly and reasonably compensate Bakke for her medical expenses, the only damage question for the jury to decide was the amount necessary to compensate Bakke for her pain, suffering, and disability. In answering this question, the jury was instructed that it should keep in mind Bakke's duty to use ordinary care to mitigate damages. *See* WIS JI—CIVIL 1730 (2012). The jury was told that if it found that "Bakke did not do so*, [it] should not include in [its] answer to the damage question any amount for consequences of the injury which reasonably could have been avoided*." *See **id.*** (emphasis added).

7

¶16   As noted above, Northland agrees that the jury was properly instructed regarding Bakke's duty to mitigate her damages.   Northland nevertheless argues that Bakke's failure to exercise reasonable care with respect to her treatment should also be regarded as a negligent cause of her injuries.   As Bakke points out, however, asking the jury to consider the same conduct as both contributory negligence and a failure to mitigate damages would permit "the jury to assess failure to mitigate damages twice."   Northland's argument for double counting Bakke's postaccident conduct has no support in Wisconsin tort law.

¶17   The authorities cited by Northland do not cast doubt on the circuit court's decision regarding the content of the special verdict.   Northland points to *Clark v. Leisure Vehicles, Inc.*, 96 Wis. 2d 607, 292 N.W.2d 630 (1980), in which our supreme court remanded a case for a new trial based on a flawed verdict question asking whether a particular defendant's negligence was "the" cause of the plaintiff's injury.   *Id.* at 619-20.   The court explained that even though the jury was properly instructed that an injury could have multiple causes, the flawed wording of this question deprived the jury of the opportunity to evaluate whether the defendant's negligence was "a" cause of the plaintiff's injury.   *Id*.

¶18   *Clark* is not helpful to Northland because the special verdict questions in the present case properly guided the jury to consider each party's causal negligence when allocating fault.   The verdict questions requiring the jury to base its allocation of the parties' negligence upon conduct occurring at or before the accident prevented juror confusion by ensuring that the jury did not double count Bakke's failure to exercise reasonable care to mitigate her damages after she was injured.

¶19     Northland further argues that viewing Bakke's postaccident conduct as causal negligence is appropriate in this case because Bakke was seeking recovery for a "continuing cognitive injury." Northland explains that although its negligent conduct may have caused Bakke to fall, which in turn may have started Bakke's cognitive injury, "Bakke's subsequent refusal to treat her concussion caused her to have long-term cognitive problems that she might not otherwise have had." Bakke urges us to reject this argument as waived because Northland failed to raise it at the circuit court level. *See State v. Dietzen*, 164 Wis. 2d 205, 212, 474 N.W.2d 753 (Ct. App. 1991) (an appellate court need not address an argument that a party has waived by not raising in the circuit court). Northland responds that "while the nuances of [its] argument have been refined since its postverdict motion, the core has remained unchanged." Northland does not point us to anywhere in the record where it characterized Bakke's injury as a continuing injury, so we decline to address this aspect of its argument.[4]

---

[4] We note that Bakke is making a forfeiture argument and not a waiver argument. *See generally State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612 ("forfeiture is the failure to make the timely assertion of a right, [whereas] waiver is the intentional relinquishment or abandonment of a known right.") Our supreme court has explained that "[a]lthough cases sometimes use the words 'forfeiture' and 'waiver' interchangeably, the two words embody very different legal concepts." *Id*.

Even if Northland had preserved its argument regarding Bakke's continuing cognitive injury, we can easily reject it on the merits. Not only is this argument unsupported by any authority, it is also unsupported by any evidence. As Bakke points out, Northland did not "offer any evidence that Bakke's injuries could have been reduced, or that her suffering could have been avoided with more treatment." Northland argues that such evidence was unnecessary because the jury could use its common knowledge and ordinary experience to determine that Bakke's failure to treat her injury caused the injury to persist. *See Pinter v. Village of Stetsonville*, 2019 WI 74, ¶63, 387 Wis. 2d 475, 929 N.W.2d 547 ("[I]f the matter is one of common knowledge or within the realm of ordinary experience, expert testimony is not required."). We disagree with Northland's unsupported assumption that the nature and extent of ongoing cognitive problems associated with a brain injury are a matter of common knowledge or within the realm of ordinary experience. Without expert testimony, the jury would not be able to determine whether Bakke could have avoided the ongoing consequences of her brain injury with reasonable treatment.

¶20    Finally, Northland argues that the special verdict created a risk of juror confusion because "[t]here was absolutely *nothing* within the four corners of the special verdict that asked the jury to consider Bakke's postaccident conduct." As a result, Northland asserts that the jury may have been confused by the contrast between the special verdict question regarding Bakke's conduct at or prior to the accident and the failure to mitigate instruction, which called for the jury to "silently factor [Bakke's] … postaccident conduct into their calculation of damages."

¶21    Northland's argument, however, ignores the wording of the verdict form. As noted above, the verdict form instructed the jury to insert the amount it determined would fairly and reasonably compensate Bakke for her past pain, suffering, and disability. The circuit court then instructed the jury to exclude from its award any damages that were caused by Bakke's failure to mitigate. In this way, the jury was clearly tasked with determining how Bakke's failure to promptly seek and participate in recommended treatment for her injuries affected the damages award, if at all.

¶22    We further note that Northland's reply brief disavows any argument that the jury instruction was insufficient to put the issue of failure to mitigate damages before the jury. We therefore reject Northland's suggestion that the jury may have been confused about how to properly evaluate Bakke's postaccident conduct.

II.  Jillson's photographs

¶23    Northland also challenges the circuit court's decision to deny the jury's request to view photographs taken by Northland's expert, Jillson. "The [circuit court] has discretion to determine what exhibits will be permitted in the

jury room." ***Badger Bearing, Inc. v. Drives & Bearings, Inc.***, 111 Wis. 2d 659, 669, 331 N.W.2d 847 (Ct. App. 1983). Even when an exhibit has been admitted into evidence without objection, "the [circuit court] still retain[s] discretion to determine whether or not this evidence should be allowed to go to the jury room." ***Schnepf v. Rosenthal***, 53 Wis. 2d 268, 272-73, 193 N.W.2d 32 (1972). We review the circuit court's determination for an erroneous exercise of discretion. *See id*. at 273. In exercising its discretion, the court should consider "whether the exhibit will aid the jury in proper consideration of the case, whether a party will be unduly prejudiced by submission of the exhibit, and whether the exhibit could be subjected to improper use by the jury." ***State v. Jensen***, 147 Wis. 2d 240, 260, 432 N.W.2d 913 (1988).

¶24     Here, the circuit court explained that the photographs requested by the jury were "voluminous" pictures of the board itself that Northland had "used countless times" as an exhibit during the trial. The photographs were "not numbered in any way, shape, or form," and many of the photographs of the board had been greatly magnified to an unknown degree. The court concluded that the board itself was "the best piece of illustrative evidence" and that viewing "40 or more blown up pictures of the board … will confuse the jury."

¶25     Northland contends that Jillson's photographs were critical evidence to support its defense that Northland was not the cause of Bakke's injuries because the photographs "showed the level of rot present on the stairs generally." According to Northland, the photographs would have permitted the jury to "have easily seen that the wood was demonstrably weakened by rot." Northland does not identify which of the twenty-five pages of pictures demonstrably shows rot, so we have no basis for evaluating this contention. Not only is Northland's argument unsupported by any citations to the record, but it is also unsupported by

Northland's own conduct at trial—as Bakke points out, Northland never published any of Jillson's photographs to the jury.[5] Instead, Northland relied on the actual board during trial, which supports the circuit court's conclusion that the board itself was the best evidence of the board's condition. We therefore reject Northland's argument that Jillson's photographs were critical to its defense.

¶26 The circuit court's decision not to give the jury voluminous photographs that were cumulative to the physical evidence is supported by our supreme court's decision in *Shoemaker v. Marc's Big Boy*, 51 Wis. 2d 611, 187 N.W.2d 815 (1971). In *Shoemaker*, the trial judge refused to permit an accident report to be sent to the jury room, even though the report had been admitted into evidence and read to the jury. *See id*. at 618-19. The judge explained that "much of the testimony in the written report was cumulative to the testimonial evidence and he did not wish to overemphasize the written statements of the report." *Id*. at 619. Our supreme court concluded that the circuit court had properly exercised its discretion in refusing to send the report to the jury. *See id*.

¶27 The case for not sending Jillson's photographs to the jury is even stronger than in *Shoemaker*, where the contents of the report had been read to the jury during trial. *See id*. at 618. In contrast, Northland did not publish Jillson's photographs to the jury during trial, so the jury would have been viewing them for the first time during its deliberations. As Bakke points out, "[t]he jury would be

---

[5] For similar reasons, we reject Northland's argument that sending Jillson's photographs to the jury room would have bolstered Jillson's credibility by showing the "meticulous level of detail in his investigation." In its brief, Northland identifies many differences in the level of detail between Jillson's investigation and Abbott's investigation that it called to the jury's attention during trial. If Northland believes that Jillson's photographs would have helped to sharpen the contrast between the two experts, Northland could have published these photographs to the jury during trial.

left to interpret [the photographs] without any witness testimony as to what was contained in the photographs and without the benefit of cross-examination." Thus, not only were Jillson's photographs cumulative to the physical evidence that was presented at trial, but they would likely have been confusing to the jury and would have distracted it from the evidence that the parties had relied upon during trial. We therefore conclude that the circuit court did not erroneously exercise its discretion by refusing to send Jillson's photographs to the jury room.

¶28 The fact that the jury requested Jillson's photographs at the beginning of deliberations does not change our analysis, nor does Brown's affidavit relating the juror's complaint about not being able to see the photographs. Whether the jury believes that having particular evidence may be helpful is not among the factors that the circuit court must consider when deciding whether to send evidence into the jury room. *See Jensen*, 147 Wis. 2d at 260. In particular, it is for *the court* to determine "whether the exhibit will aid the jury in *proper* consideration of the case." *Id.* (emphasis added). We further note that, here, the jurors had no reason to believe that viewing the photographs in the jury room would have aided their proper consideration of the case given the fact that the photographs had never been published to the jury.

## CONCLUSION

¶29 We conclude that the special verdict question regarding Bakke's causal negligence correctly reflected Wisconsin tort law. We further conclude that the circuit court did not erroneously exercise its discretion by refusing to send Jillson's photographs to the jury room. We therefore affirm the judgment and the court's order denying Northland's postverdict motion.

*By the Court.*—Judgment and order affirmed.

13

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.